[No. A088619. First Dist., Div. Three. Oct. 12, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
WALTER VINCENT ROBBIE, JR., Defendant and Appellant.

[No. A093142. First Dist., Div. Three. Oct. 12, 2001.]

In re WALTER VINCENT ROBBIE, JR., on Habeas Corpus.

**COUNSEL**

Stephen Chapman Matchett for Defendant and Appellant.

Bill Lockyer, Attorney General, and David H. Rose, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**CORRIGAN, J.**—Defendant was convicted of kidnapping for sexual purposes, oral copulation and penetration with a foreign object. Because the court improperly allowed the prosecution to elicit inadmissible profile evidence, we reverse.

### Statement of Facts and Procedural History

The prosecution's witnesses gave the following recitation of events. Early on the evening of February 23, 1998, 16-year-old Jane Doe and her younger sister were at home when their mother left to attend church classes. About 15 minutes later, Jane told her sister she was going to use the telephone at the neighboring Escalante house because her own family's phone was not working. Instead, Jane walked to a neighborhood pay phone and called her boyfriend Eddie Estrada. Jane's mother had previously told Jane to have no

contact with Eddie. While on the phone, Jane noticed a white truck with a camper shell parked near the phone booth and told Eddie that the driver appeared to be watching her. Eddie told her to go home and she did. Eddie corroborated this testimony at trial.

When Jane returned home, it was dusk. The lights were off and the door was locked. She walked to the Escalante house, believing her sister might be there. She noticed a white truck, similar to the one she had seen earlier, parked on the street. As Jane neared the truck, she heard footsteps behind her. Defendant grabbed her shirt and held something sharp against her back. He told her not to scream, and forced her into the truck, where she sat on the floorboard, crying. Defendant got in and started the engine. He told Jane to take off her shirt and bra, and not to scream. After five or ten minutes, defendant ordered Jane to lie on her back on the passenger seat with her head next to his thigh. At defendant's direction, she pulled her pants and underwear to her ankles. Defendant touched her breasts and placed his fingers in her vagina, commenting "nice pussy."

Jane was able to determine defendant's route of travel by looking up at street signs while he drove. Defendant stopped in a deserted, hilly area and opened the truck's tailgate. He told her to slide out of the truck, dragged her to the back and made her crawl inside the camper shell. At his direction, Jane took off all her remaining clothing. Defendant then opened his pants and got in the back of the truck.

Jane asked defendant not to have intercourse with her because she was menstruating. Defendant pulled down his pants and told Jane to orally copulate him. She gagged as she did so. Defendant became very angry because Jane was gagging and spitting. He grabbed the back of her head and told her, "Don't come off it again, or I'll kill you." Defendant rubbed a knife against her back. When defendant finally ejaculated into her mouth, Jane vomited. During the encounter he also put his tongue and finger in her vagina.

Jane told defendant that she had to urinate and he responded that she could not do so because he would not allow her out of the truck. Because Jane insisted, he told her to urinate in the truck, which she did. When Jane complained that she was cold, defendant told her she was done, throwing her pants and underwear at her. As she dressed, Jane noticed menstrual blood on her hands and thighs. Defendant then walked her to the cab of the truck. When he opened the door, her shirt and bra fell out. She grabbed them and put them on.

Defendant acted in a friendly manner during the drive back. He questioned Jane as to where she lived and worked and if she went to school. He also told

her not to tell anyone what had happened or he would kill her. He dropped her off in her neighborhood, said good-bye and told her to be careful. Jane ran to the Escalante house where Lillian Escalante called the police.

Jane's 13-year-old sister Sue testified that she became worried when Jane had not returned home. After Sue went to the Escalante house, she and Lillian Escalante drove in the neighborhood looking for Jane. A short time later Jane banged on the front door, ran into the kitchen, said she had been raped, and began to wash her mouth out. Jane was so upset that Sue started to cry.

Lillian Escalante testified that when Jane came to the door she wrapped her arms around Escalante's neck and sobbed. Escalante saw blood on Jane's fingers. Jane explained that her fingers were bloody because she inserted them into herself to show defendant she was menstruating. Jane told Lillian that defendant had put a knife to her throat, forced her into a truck, and made her orally copulate him. She also told Escalante that afterwards she urinated in the back of the camper. Jane was shaking but coherent as she related these details. The police officer who responded testified Jane was visibly shaken and crying, making it difficult for him to understand her.

Less than two weeks after the incident Jane reported seeing defendant in his truck across from her house. He was subsequently arrested.

The defense case presented a dramatically different version of the incident and the complaining witness's character. Defendant testified that he had many friends in Jane's neighborhood and visited the area frequently. He often visited Debbie, a friend who lived in an apartment complex across from Jane's house. He was leaving Debbie's apartment on the evening of the incident when Jane called out to him. He had never seen her before. Jane said she wanted to talk to him about something, but was on her way to make a phone call. They arranged to meet when she finished her call, and defendant arrived while she was still on the phone. When she finished, Jane spoke to defendant, calling him by his last name. She told him she had seen him at a bar where he worked as a bouncer and also when he visited Debbie. Jane asked defendant whether he had any "crank," referring to methamphetamine. Defendant did not want sell to Jane, but agreed to give her drugs if she orally copulated and had sexual intercourse with him.

The two got in defendant's truck and drove to a construction site in the hills. Jane did not remove any clothing as they traveled, nor did he fondle her. Defendant parked in a vacant lot and they both got in the back of the

truck. Jane said she did not have much time. She began orally copulating defendant, but stopped because she needed to urinate. It was cold, so defendant allowed her to urinate inside his truck. After she did so, Jane told him that she had started her period. Defendant said, "Oh, well, wait a minute. Now, this changes everything." Not wanting to have sexual intercourse with her while she was menstruating, he told her to continue orally copulating him and they would "work it out." Jane became upset and defendant ordered her to "finish." He pulled her head down to his penis and ejaculated in her mouth, after which she spit out the semen. Defendant was angry and told Jane that she had manipulated him, claiming she knew all along that she was menstruating and had not bargained in good faith. Defendant drove Jane back to her neighborhood and threw $7 at her as she got out of the truck.

The defendant called witnesses, including family members, who testified to his nonviolent and honest character. Jane's former boyfriend James Pouliot and her high school classmates Alfred Williams, Amber Devos and Angela Emery described the victim as untruthful. Williams testified that Jane "lies about everybody" and lied when she told friends that her relationship with Williams ended because she would not have sex. According to Devos, Jane said that Nathan McNamar, a friend from church, tried to remove Jane's shirt while they were at the park, but Jane pushed him away. McNamar testified and denied the incident. Devos described an occasion when she saw Jane take her perfume and brush, but Jane denied doing so when confronted. Emery testified that Jane made comments about other schoolmates that were untrue. None of these witnesses testified that Jane used drugs. However, two other witnesses did speak to the subject.

Witness Mike O'Hara, who was in custody at the time of his testimony, met defendant in jail where they had "many" conversations. O'Hara testified that he and his friend Cliff had seen Jane in February 1998 loitering near the pay phone. O'Hara had never seen Jane before, but Cliff invited her to join them on a fishing trip. Jane brought along methamphetamine and smoked it with Cliff. When a defense investigator met O'Hara at the jail and showed him a single yearbook page, O'Hara pointed to Jane's photograph. The investigator acknowledged Jane's photo was the only one depicting a white teenager with light hair. Hector Urbina, an admitted heroin addict, was also in custody at the time he testified. Urbina knew defendant from his job as a bouncer. They were in custody together between August and October 1998, spoke several times and discussed the case. Urbina testified that Jane was a "dope fiend" who had tried to buy methamphetamine from him about four times.

The jury convicted defendant on the substantive charges but did not find the arming clause true. Defendant was sentenced to an indeterminate term of 15 years to life. Other terms were either stayed or ordered to run concurrently.

*Discussion*

*Admission of Expert Testimony*

*Background*

The prosecution intended to call Sharon Pagaling, a special agent with the California Department of Justice. During pretrial motions, the court asked, "You are intending to call . . . a Department of Justice expert, perhaps, to testify *that . . . defendant's conduct was consistent with being a rapist*; is that correct?" (Italics added.) The prosecutor responded, "That's correct." Defense counsel objected, arguing that expert testimony must be limited to general misconceptions about sex offenders, and that an expert cannot render an opinion as to whether a defendant committed the charged crimes. Counsel advised that he might ask for an Evidence Code section 402 hearing unless the prosecutor could be more specific about Pagaling's expected testimony. The prosecutor responded: "Essentially that the comments the defendant made to the victim throughout the course of the incident *are consistent with a certain type of rapist*, the comments he made after the incident *are also consistent with that type of rapist*. He engages her in small talk on the way back. . . . The fact that he returns to a location near where the incident occurred in a very short time frame after it happened, . . . just half a block from where he nabbed her, *that's also not inconsistent or, in fact, consistent with this type of rapist*." (Italics added.)

Based on the prosecutor's comments, the court found an Evidence Code section 402 hearing unnecessary and ruled Pagaling's testimony admissible: "The People have indicated they intend to bring an expert from the Department of Justice to show that certain conduct of the type engaged in by the defendant in this case was or *is consistent with* the conduct of a person who has committed the kinds of sexual crimes alleged here. [¶] To the extent that [defendant is moving] to exclude such testimony, it's denied. I think [the prosecutor] understands that the expert cannot come in here and testify that [defendant] is the one who committed these crimes . . . . *I think all he has indicated is that he intends to have this expert come in here and testify that the kinds of conduct that [defendant] may have engaged in, in this case, is the kind that a person can engage in consistent with the commission of such*

*crimes*." (Italics added.) The prosecutor then assured the court that he was offering Pagaling's testimony only "to disabuse the jury of common misperceptions [*sic*] about conduct of a rapist." The court stated, "Understood. And to the extent that that's all you are having the witness do, . . . the motion to exclude is denied."

The prosecutor offered Pagaling as an expert "in the area of the behaviors and conduct of persons who commit sexual assaults." Pagaling supervises the Violent Crime Profiling Unit in the Department of Justice's Bureau of Investigation. Half of her caseload involves crimes with unknown perpetrators. Her unit analyzes the available facts to determine an offender's personality and lifestyle, thus narrowing the scope of the investigation. The remainder of Pagaling's caseload involves known criminals. She might, for example, evaluate an offender who had committed certain crimes to ascertain if he might also be responsible for other unsolved ones. Pagaling's work is not limited to sex crimes.

Pagaling has been an agent with the California Bureau of Investigation since 1988, and has investigated a variety of cases. To learn about the behavior of sexual offenders she attended numerous law enforcement courses, reviewed research material and consulted other analysts in the field. Pagaling has also interviewed rape victims. She holds a bachelor of arts degree in government and has taken some graduate courses in psychology and counseling.

In response to hypothetical questions by the prosecutor, Pagaling explained that not all rapes involve violence or injury to the victim, and that offenders often return to the area where they contacted the victim because the offender lives, works or visits there. In the form of hypotheticals, the prosecutor asked Pagaling to consider various kinds of conduct. When asked whether "these people engage in small talk with their victims," Pagaling responded that such behavior is "common." According to Pagaling, a certain type of offender may believe the sexual encounter is consensual because he has a "cognitive distortion." Pagaling explained that it was "common" for a rapist to acquiesce to the victim's request not to have sexual intercourse and to negotiate with her regarding other sex acts. Pagaling explained, "[T]his type of offender does not choose to use . . . physical force to get what he wants." Pagaling stated that it was very common for the offender to return the victim to her neighborhood, and ask questions about her life. The questions indicate the offender is rationalizing the event as consensual. Pagaling stated that the comment "nice pussy" is "consistent" with the kind of comment a rapist makes, and that a rapist will often compliment his victim. Finally, the prosecutor posed the following summary hypothetical:

"And a pattern that encompasses all of the conduct that I just mentioned, the comment about 'nice pussy,' the negotiation with the suspect and victim over certain sexual acts, the suspect driving the victim back to where he believes she lives or asks questions about the victim, about her prior life; after the offense, and then the suspect, in fact, returning to that area days later, looking at all of that as a whole, what if any conclusion do you reach about that conduct?" Pagaling answered, "That it's the most prevalent type of behavior pattern that I have seen with sex offenders. It's the most common type of behavior pattern."

In cross-examination, Pagaling labeled this pattern "a consensual sex sequence" and further described it: "[W]hat I would consider a consensual sequence would be verbal behavior that is commanding, doesn't include profanity, might be complimentary. There is an effort made by the offender to reassure the victim. [¶] A lot of times he tells her that she is okay, he won't hurt her if she does what he says. He tries to get her to—he encourages her verbally to do what he wants, and she'll be okay. And he will let her go. And there is typically small talk, if you will, included in that. [¶] He may ask questions about her personal life. Where does she live? Does she go to school? Does she have a boyfriend? Is she sexually active, those kinds of questions. [¶] The sexual behavior is a consensual sexual sequence. So, the offender commonly will try to please the victim sexually, will try to make her feel good. The things he chooses to do, he will do things to—so that she will feel good. So that he would, for instance, orally copulate her. He will fondle her. He will ask her if it feels good. He won't make her do things that she doesn't want to do. He will negotiate with her. If she says that she doesn't want to do a certain type of thing, then he will ask her to do something else. And that's what will actually occur. [¶] As far as the physical behaviors go, there is a very minimal amount of force. Usually, any force that is used is at the beginning of the assault where he will put his hands on her. The only force that typically occurs during the assault or later is if the victim physically resists it. Then he will use enough force to overcome that resistance, and then . . . he will return to a non-forced interaction with her."

Pagaling admitted on cross-examination that the conduct she described was equally consistent with consensual activity.

*Analysis*

■ The decision of a trial court to admit expert testimony " 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.' "

(*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 [283 Cal.Rptr. 382, 812 P.2d 563], quoting *People v. Kelly* (1976) 17 Cal.3d 24, 39 [130 Cal.Rptr. 144, 549 P.2d 1240].) ▇ Because Pagaling's testimony constituted improper profile evidence, we conclude that such an abuse occurred here.

▇ A profile is a collection of conduct and characteristics commonly displayed by those who commit a certain crime. One court has described profile evidence as "a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in a specific illegal activity." (*U.S. v. McDonald* (10th Cir. 1991) 933 F.2d 1519, 1521.) Perhaps the most frequently cited example is the drug courier profile, which the United States Supreme Court has defined as "a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics." (*Reid v. Georgia* (1980) 448 U.S. 438, 440 [100 S.Ct. 2752, 2754, 65 L.Ed.2d 890].)

▇ Here, Pagaling was never directly asked to opine whether defendant was a sex offender. Instead, the prosecutor incorporated Jane's description of his conduct into hypothetical questions. In this context the expert responded that the behavior set out in the prosecutor's questions was typical of a particular kind of criminal. In response to prosecution hypotheticals, Pagaling described defendant's conduct as the "most prevalent type of behavior that I've seen with sex offenders." While never characterized as such, this was profile evidence.

▇ Profile evidence is generally inadmissible to prove guilt. Drug courier profiles have been held to be " 'inherently prejudicial because of the potential they have for including innocent citizens as profiled drug couriers. . . . Every defendant has a right to be tried based on the evidence against him or her, not on the techniques utilized by law enforcement officials in investigating criminal activity. Drug courier profile evidence is nothing more than the opinion of those officers conducting an investigation.' " (*U.S. v. Beltran-Rios* (9th Cir. 1989) 878 F.2d 1208, 1210, quoting *United States v. Hernandez-Cuartas* (11th Cir. 1983) 717 F.2d 552, 555.)

Relying on the reasoning of drug courier cases, the court in *People v. Martinez* (1992) 10 Cal.App.4th 1001 [12 Cal.Rptr.2d 838] rejected the use of profile evidence in the case of a defendant arrested while driving a stolen truck. Although the truck's license plates had been replaced and the certificate of registration forged, the defendant claimed he did not know the truck was stolen. (*Id.* at p. 1003.) Police investigators were allowed to testify about the operation of auto theft rings in the area. (*Id.* at pp. 1004-1005.) Several

aspects of these operations matched the defendant's circumstances at the time of his arrest, including the type of truck he was driving and his route of travel. Like the defendant, the majority of those arrested in these rings denied knowing the vehicle was stolen. The appellate court observed that "although the evidence was not characterized per se as a 'profile,' the clear thrust of the evidence was to establish that defendant 'fit' a certain 'profile.' " (*Id.* at p. 1006.) Concluding the evidence was inadmissible, the court stated: "While the similarities may be a proper consideration for law enforcement in investigating criminal activity, they are inappropriate for consideration on the issue of guilt or innocence for the very reason given in the drug courier profile cases: the potential of including innocent people as well as the guilty." (*Ibid.*)

Similarly, in *People v. Castaneda* (1997) 55 Cal.App.4th 1067 [64 Cal.Rptr.2d 395], testimony that the defendant "perfectly fit" the "profile of the typical heroin dealer in Northern San Diego County" was inadmissible in a trial for possession of heroin. The court held that "every defendant has the right to be tried based on evidence tying him to the specific crime charged, and not on general facts accumulated by law enforcement regarding a particular criminal profile." (*Id.* at p. 1072.)

As these cases indicate, profile evidence is inherently prejudicial because it requires the jury to accept an erroneous starting point in its consideration of the evidence. We illustrate the problem by examining the syllogism underlying profile evidence: criminals act in a certain way; the defendant acted that way; therefore, the defendant is a criminal. Guilt flows ineluctably from the major premise through the minor one to the conclusion. The problem is the major premise is faulty. It implies that criminals, and only criminals, act in a given way. In fact, certain behavior may be consistent with both innocent and illegal behavior, as the People's expert conceded here.

This flawed syllogism lay at the heart of Pagaling's testimony. She was asked hypothetical questions assuming certain behavior that had been attributed to the defendant and was allowed to opine that it was the most prevalent kind of sex offender conduct. The jury was invited to conclude that if defendant engaged in the conduct described, he was indeed a sex offender.

The Attorney General disputes the characterization of Pagaling's testimony as profile evidence. He contends that Pagaling's testimony was admissible to disabuse the jury of misconceptions about rapists. The Attorney General claims "[a] common citizen, inexperienced in rape and rapists, could

be understood naturally to believe that a rape is a harsh, violent, threatening, and unrelentingly brutal experience."[1] He argues that under the authority of *People v. McAlpin, supra,* 53 Cal.3d 1289, the testimony was properly admitted. His reliance on *McAlpin* is misplaced.

McAlpin was accused of fondling an eight-year-old girl. He put before the jury extensive evidence of his collegiate education, naval service and employment in responsible positions with major companies. He also called two character witnesses who testified about his fine reputation for honesty. A police officer testified for the prosecution that there is no profile of a typical child molester. (*People v. McAlpin, supra,* 53 Cal.3d at p. 1299.) The officer explained that a child molester "can be of any social or financial status, any race, any age, any occupation, any geographical origin, and any religious belief or no religious belief at all. Finally, [the officer] testified that such offenders can also be persons of good or even impeccable reputations in the community." (*Ibid.*) The Supreme Court held the trial court did not abuse its discretion in admitting this evidence because it served to refute a commonly held stereotype. The court observed that "it is reasonable to conclude that many jurors would tend to rely not so much on their personal intuition but on the widespread public image of the child molester as an old man in shabby clothes who loiters in playgrounds or schoolyards and lures unsuspecting children into sexual contact by offering them candy or money." (*Id.* at p. 1302.) The court noted that numerous studies have demonstrated that this stereotype is deeply engrained in the public consciousness. "The same studies report that in most cases the child molester is not in fact a stranger to his victim, is not an old man, is not an alcoholic, is not mentally retarded, and is not homosexual. . . . 'Thus, it is appropriate to conclude that under the current state of scientific knowledge, there is no profile of a "typical" child molester.' " (*Id.* at p. 1303.) The officer testified during the People's case-in- chief. But even before the jury heard McAlpin's character evidence, it knew the defendant was neither elderly nor a stranger to the victim, and it could infer from other evidence that he was not homosexual. (*Id.* at p. 1304.) The court concluded that the officer's testimony "would therefore 'assist the trier of fact' (Evid. Code § 801, subd. (a)) by giving the jurors information they needed to objectively evaluate the People's evidence." (*Id.* at p. 1303.)

Profile evidence is unfairly relied upon to affirmatively prove a defendant's guilt based on his match with the profile. The jury is improperly invited

[1]Defense counsel did not challenge the existence of public misconceptions about sex offenders, requiring the admission of expert testimony. Evidence Code section 801, subdivision (a) requires that expert testimony be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." The presupposition that the public shares the mistaken view articulated by the Attorney General is certainly debatable. Because no objection on this ground was made, however, the issue was never joined at the trial level.

to conclude that, because the defendant manifested some characteristics, he committed a crime. The evidence in *McAlpin* was not admitted for this improper purpose. It was not offered to establish a stereotype, then condemn the defendant for fitting it. Instead, the *McAlpin* evidence was admitted in recognition that a misleading notion existed in the public consciousness and to disabuse jurors of the misconception. The faulty syllogism attacked in *McAlpin* ran as follows: child molesters share certain characteristics; the defendant did not manifest these characteristics; therefore, the defendant is not a child molester. The testimony of the *McAlpin* expert was admitted not to establish the major premise, but to refute it by explaining that there is no profile of a "typical" child molester. There was no argument that McAlpin must be guilty because he fit a profile. Instead the jury was correctly informed that no such uniformity exists and they should not acquit the defendant merely because he did not fit some nonexistent mold. Freed from stereotypical constraints, the jurors could objectively evaluate the evidence.

The Attorney General argues, in essence, that a similar exculpatory syllogism was in play here: all rapists are brutal, defendant was not brutal, therefore he was not a rapist. Pagaling properly could have testified that rapists behave in a variety of ways and that there is no "typical rapist." Had she done so her testimony would have been similar to that permitted in *McAlpin*. The problem here is that Pagaling did not merely attack the stereotype by explaining that there is no "typical sex offender." Instead, she replaced the brutal rapist archetype with another image: an offender whose behavioral pattern exactly matched defendant's. Pagaling maintained the impermissible syllogism; she simply varied the major premise to match defendant, then varied the minor premise to prove guilt rather than innocence. The effect of Pagaling's testimony was not to help the jury objectively evaluate the prosecution's evidence, as in *McAlpin*, but to guide the jury to the conclusion that defendant was guilty because he fit the profile.

■    An additional error occurred when Pagaling testified about offenders' thought processes. Pagaling's discussion of the "cognitive distortions" causing an offender to believe the victim is consenting was inadmissible. These observations far exceeded the scope of her proffered testimony. Further, the record does not demonstrate Pagaling was qualified to testify about the motivations or cognitive processes of those whose behavior she observes.

■    We cannot conclude the admission of this evidence was harmless error. Defendant and Jane gave starkly conflicting versions of events. Jane testified that she was kidnapped and subjected to an ordeal during which she

cried, pleaded and became physically ill. Conversely, defendant related that Jane initiated their meeting, agreed to an exchange of sex for drugs, voluntarily accompanied him in his truck and willingly engaged in various acts. Defendant contended that Jane falsely claimed rape because he did not give her drugs and because she needed to account for her absence from home. Jane's testimony was corroborated in part by Eddie Estrada, who confirmed that she mentioned the white truck while speaking with him on the pay phone, and by the other witnesses who described her as very upset immediately after the incident. On the other hand, Jane acknowledged lying about her reason for leaving the house the night of the incident, and other witnesses testified that she is untruthful. Two witnesses also testified that Jane used drugs.

In closing argument the prosecutor emphasized Pagaling's testimony. He argued that defendant suffered from a warped sense of reality "along the lines of [*sic*] Ms. Pagaling was talking about." He told the jury: "[Pagaling] explained to you how there's a type of rapist that interacts with the victim and after the act is over in that rapist['s] mind, that person thinks that that person is friends of the victim, engage in small talk in chatting, say things like, be careful[] when she leaves the car. It's all consistent with this certain type of rapist. You heard the testimony of Ms. Pagaling . . . . Ms. Pagaling told you about how these guys have this warped sense of reality and I submit to you that [defendant's] testimony provides you with many example[s], of his warped sense of reality several times."

We do not hold that admission of profile evidence is reversible per se. Here, however, the jury's verdict depended largely on whether it found Jane or the defendant more credible. Jane's credibility had been directly attacked but was significantly bolstered by the expert's testimony.

We review the case on a cold record. There are many other factors including demeanor, tone of voice, and overall attitude toward testimony that a jury weighs in the balance but are unavailable to us. We, however, are challenged to make a determination based on the information we do have. Given the highly prejudical nature of the expert's testimony and the prosecutor's argument, we must conclude there is a reasonable probability the jury would have reached a result more favorable to defendant had the court excluded Pagaling's testimony. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Given this conclusion, we need not discuss defendant's other contentions or address his habeas corpus petition.

*Disposition*

The judgment is reversed and the matter remanded to the trial court. In light of this resolution, defendant's habeas corpus petition is dismissed as moot.

McGuiness, P. J., and Horner, J.,* concurred.

A petition for a rehearing was denied November 8, 2001, and on October 25, 2001, the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied January 16, 2002.

*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.