Filed 7/26/21  P. v. Whitworth CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074471 |
| v. | (Super.Ct.No. FSB1205111) |
| DARON LAMAR WHITWORTH, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Elia V. Pirozzi, Judge.  Affirmed with directions.

Jason L. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Daron Lamar Whitworth of 29 sex crimes involving the same minor victim, Jane Doe (Pen. Code, §§ 261.5, subds. (c), (d), 266j, 286, subd. (b)(1),

1

288.3, subd. (a); unlabeled statutory references are to this code), and two counts of pimping Doe under section 266h, subdivision (b). One of the pimping convictions was for conduct that occurred before Doe turned 16 years old, and the other conviction was for conduct that occurred when she was 16 years old. Whitworth was sentenced to 28 years and eight months in state prison.

On appeal, Whitworth argues that (1) the trial court prejudicially erred by admitting profile evidence from an expert witness about the general characteristics and types of pimps, (2) section 954 prohibits conviction of multiple offenses for pimping under section 266h because the crime involves a single, continuous course of conduct regardless of the victim's age, and (3) the imposition of various fines and fees without a determination of his ability to pay violated his right to due process. We correct an error in the abstract of judgment but otherwise affirm the judgment.

BACKGROUND

A. *Doe's Testimony*

Doe was born in June 1995. In December 2010, Doe's older sister was receiving services from EMQ, which provided wraparound services for teenagers "getting out of the system." That year, when Doe was 15 years old, Doe attended a Christmas party at the EMQ office with her older sister. At the party, Whitworth approached Doe, the two talked for a couple of hours, and they exchanged contact information. Whitworth was 40 years old and worked at EMQ.

Within two days of the party, Doe contacted Whitworth to arrange to meet with him and to hang out. Two or three days after the party, Whitworth picked up Doe from a

2

fast food restaurant instead of her house. Doe did not want her mother to see Whitworth, because Doe believed that Whitworth was approximately 30 years old. Whitworth took Doe to his house, where they talked, "kicked back, chilled, watched some movies, dr[a]nk a little bit," and had sexual intercourse.

Over the course of the next two months, Whitworth and Doe saw each other every day. Doe initially told Whitworth that she was 18 years old. Whitworth took Doe to the shopping mall and out to eat. He also took her to Los Angeles, California to visit with some of his family and to take her to parties, bars, and clubs. Whitworth gave Doe someone else's identification card to use to get into the bars and clubs.

After Doe had been dating Whitworth for two months, she moved into his residence. Doe loved Whitworth. Things were not going well for Doe at home. She had a "rocky" relationship with her mother. After Doe moved in with Whitworth, she and Whitworth had sexual intercourse every day. They engaged in "oral sex" "[a] lot" and "anal sex" once.

Shortly after Doe moved in with Whitworth, Whitworth took her to a bachelor party. Doe thought that they would be attending a regular house party, but when they arrived she realized that there were only men present and "it was like a stripper party." Whitworth gave Doe lingerie to wear and told her that she would be hosting and dancing at the party. Doe was uncomfortable, but Whitworth gave her alcohol, cheered her on, and told her it would "be okay." Whitworth also gave her condoms and told her to have sexual intercourse with men from the party in a back room. Whitworth told Doe to charge $200 for "full service," which meant sexual intercourse and oral sex. Doe had sex

3

with three or four men that night and at Whitworth's direction gave him the money she earned.

After the bachelor party, Doe began working on the streets in San Bernardino, California, as a prostitute for Whitworth. She did not want to work as a prostitute, but she also did not want to move back home. She still loved Whitworth. Whitworth gave Doe condoms and told her what prices to charge. Whitworth showed Doe how to get the attention of customers by waving and smiling. Doe serviced customers she met while working on the street. Doe mainly worked as a prostitute during weekends and when Whitworth was not working at EMQ.

Whitworth also once took Doe to work as a prostitute for a couple of days at a motel in Bakersfield, California. At the motel, prostitutes stood in the doorways of the rooms as customers drove around a circular driveway to view them. Condoms were provided at the front desk. Doe gave Whitworth the money she earned while working at the motel.

Whitworth also took Doe to Los Angeles to stay with his relative Jacory W. and Jacory's girlfriend, Charmaine W. Charmaine worked as a prostitute and used the name Tasty. While in Los Angeles, Doe worked as a prostitute, and Jacory oversaw her. Doe gave the money she earned to Jacory, and Jacory gave it to Whitworth.

Approximately two months after Doe moved in with Whitworth, Doe's mother called Whitworth and told him Doe's real age. At some point thereafter, Doe returned to live at her mother's house. Whitworth was worried that Doe's mother was going to contact law enforcement. At some point, Doe moved back in with Whitworth.

4

Whitworth picked up Doe after she called him. Whitworth continued having sexual intercourse with Doe after he learned her actual age.

When Doe was 15 years old and living with Whitworth, a female friend of Whitworth's took photographs of Doe at Whitworth's house. Whitworth's friend showed Doe how to pose to "look sexy." Doe wore "little boy shorts" and a G-string that Whitworth had purchased for her. Doe was given alcohol during the photo shoot. She was uncomfortable having the photographs taken. The photographs were uploaded onto Whitworth's computer.

On the same day that the photographs were taken and several days before Doe's 16th birthday in June 2011, Whitworth created an advertisement for Doe on the website Backpage.com, using the photographs his friend had taken. The advertisement used Doe's escort name (Princess), indicated that she was 20 years old, referred to "roses" (a coded reference to money), and stated that she was available for both "in-calls" and "out-calls." Doe explained that for "in-calls" the client comes to the prostitute, and for "out-calls" the prostitute goes to the client. The advertisement included a disclaimer that the services offered were not "illegal." Whitworth's phone number was listed on the advertisement. Whitworth told Doe that advertising on the website would make Doe's "job" as a prostitute "easier." As a result of the advertisement, Doe went on a "prostitution date" in which she met the client at his job site and provided him with "full service."

Doe stopped working for Whitworth sometime after Doe's mother contacted Whitworth's relatives and told them Doe's age. Doe could not recall exactly when that happened.

B. *Doe's Arrest and the Investigation*

In August 2012, Doe was arrested. Doe met with Deputy Aron Wolfe of the Riverside County Sheriff's Department, who explained to Doe that he was an expert on human trafficking. Deputy Wolfe interviewed Doe three or four times. Doe told Deputy Wolfe about her relationship with Whitworth. Doe identified Whitworth in a photographic lineup. Doe told Deputy Wolfe that she stopped working as a prostitute for Whitworth in February 2012. Doe estimated that she had earned between $40,000 and $60,000 for Whitworth, but Deputy Wolfe's financial investigation revealed no evidence that Whitworth had earned that amount of money when Doe worked for him.

At the request of law enforcement, Doe made a "pretext call" to Whitworth to attempt to elicit information about his alleged crimes. The phone call was recorded. A recording of the call was played at trial, and the jury was given a transcript of the call. Doe called Whitworth at the same phone number that was used in the online advertisement.

Doe told Whitworth that she missed him, mentioned that she was 17 years old, and said that she was interested in making money with him again. Whitworth said that he missed Doe, was "ready for [Doe] to come back," and was "definitely" interested in "get[ting] some money" with her. He noted that Doe's timing was bad because he had to work, but he said that they "could definitely do on the weekends" and that he could start

6

"putting some shit together" while he was at work. Whitworth also told Doe that he would like to see her and Tasty "back together." Whitworth told Doe that she could teach Whitworth what she had learned and then they could put their own "angle to the game." Whitworth was worried about Doe's mother and warned that they had to be "inconspicuous" going forward. Doe asked Whitworth if he "miss[ed] the sex" and "miss[ed] [her] sex," and he responded "[o]f course" to both questions. Immediately after the call ended, Whitworth texted Doe a photograph of himself.

In November 2012, law enforcement officers searched Whitworth's residence and seized a laptop. Whitworth's resume was stored on the laptop. The laptop's hard drive also had a folder labeled "Princess" that contained both the photographs of Doe that were used in the Backpage.com advertisement and an image of a disclaimer about prostitution services.

C. *Expert Testimony*

Deputy Wolfe testified as an expert on pimping, pandering, and human trafficking. He defined various common terms used in prostitution. "[P]rostitution" is the exchange of sex for money. "The game" refers to the "subculture of prostitution. The game is prostitution. . . . It's the life of prostitution." Prostitutes often refer to their pimps as "Daddy." A "circuit" is a group of cities that pimps and prostitutes travel through. A customer who pays a prostitute for sexual services is referred to as a "john," a "trick," or a "date." "Full service" means providing "both vaginal and oral sex." For an "in-call" the customer meets the prostitute at her location, usually a motel or hotel. Backpage.com is one of the largest websites advertising prostitution services.

Over the objection of defense counsel, Deputy Wolfe also described various types of pimps. A "Gorilla pimp," whom Deputy Wolfe characterized as the "worst type" of pimp, pimps their prostitutes by "using physical force and nothing else." "A Mac" or a "Romeo" pimp surrounds himself with a lot of girls and sometimes uses force against them, but for this type of pimp appearance is particularly important—that is, "it's more about what they look like, the clothes they're wearing, what the girls look like, the clothes they're wearing, what clubs they're going to, what cars they're driving." A "tennis shoe pimp" is a brand new pimp who does not know what he is doing.

A gorilla pimp will take a girl by force and compel her to work for him as a prostitute. The other types of pimps typically use a "grooming process" in order to get girls to work for them as prostitutes. The pimp begins the grooming process by inducing the girl to fall in love with him by showering her with love, affection, and attention, taking her out to eat, and buying her gifts. The girls whom pimps target are particularly susceptible to grooming because they typically have suffered prior sexual or physical abuse. Attention from the pimp is often the first time the girl has had a male figure "act like they love them and take care of them." Grooming eventually makes the girl believe that she and the pimp are in love with each other, so she does not want to leave the pimp or the life she is living.

Deputy Wolfe accessed Whitworth's Facebook page through Doe's account. Whitworth's Facebook name was "A True King," which Deputy Wolfe said indicated that Whitworth was presenting himself "as either a pimp or somebody who has lots of money." Whitworth's Facebook page also included a picture of a stack of money, which

8

Deputy Wolfe said was relevant because pimping is typically "about making money and they like to show off how much money they have. Typically you'll see stacks of money."

DISCUSSION

A. *Profile Evidence*

Whitworth argues that the trial court prejudicially erred by admitting profile evidence about the different types of pimps, their common characteristics, and Whitworth's Facebook page. We are not persuaded.

1. *Relevant Proceedings*

The prosecution sought to introduce expert testimony from Deputy Wolfe on pimping, pandering, and human trafficking. At a pretrial hearing on the matter, the trial court expressed concern that the testimony could "encroach into profile evidence" by identifying "characteristics of certain crimes of criminals that when taken together will constitute a typical pattern of behavior with the inference that because the defendant may match a certain profile that he's guilty of these crimes." The court did not believe that Deputy Wolfe's testimony, as described by the People, would "go[] into that area" but wanted to ensure that the People were aware of the limitation.

Defense counsel objected that the proposed testimony regarding the different types of pimps and how they recruit girls would create a profile demonstrating that pimps "look for high-risk kids to groom" and that because Whitworth worked in a group home the testimony would show that he put "himself in a place to groom." The court agreed that such testimony "would be inappropriate" but nevertheless ruled that Deputy Wolfe's testimony was admissible as long as it was not "profile evidence, and there's no inference

9

that because Mr. Whitworth may match a certain criteria that he's guilty." The prosecutor agreed that Deputy Wolfe had been instructed to not "give any opinion[] that [Whitworth] is a pimp," and the court added that Deputy Wolfe also could not "match [Whitworth] up to any of those characteristics."

2. *Analysis*

"A profile ordinarily constitutes a set of circumstances—some innocuous— characteristic of certain crimes or criminals, said to comprise a typical pattern of behavior. In profile testimony, the expert compares the behavior of the defendant to the pattern or profile and concludes the defendant fits the profile." (*People v. Prince* (2007) 40 Cal.4th 1179, 1226 (*Prince*).) "'Profile evidence,' however, is not a separate ground for excluding evidence; such evidence is inadmissible only if it is either irrelevant, lacks a foundation, or is more prejudicial than probative" under Evidence Code section 352. (*People v. Smith* (2005) 35 Cal.4th 334, 357 (*Smith*), disapproved on another ground in *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 670; *Prince*, *supra*, at p. 1226.) "Profile evidence is objectionable when it is insufficiently probative because the conduct or matter that fits the profile is as consistent with innocence as guilt." (*Smith*, *supra*, at p. 358.) We review for abuse of discretion the trial court's admission of evidence under section 352 of the Evidence Code. (*People v. Doolin* (2009) 45 Cal.4th 390, 437.)

Relying on *People v. Robbie* (2001) 92 Cal.App.4th 1075 (*Robbie*) and *People v. Martinez* (1992) 10 Cal.App.4th 1001 (*Martinez*), Whitworth claims that profile evidence is *always* inadmissible and that its admission consequently always constitutes an abuse of discretion. In *Robbie* and *Martinez*, another appellate court and this court held that the

10

trial court abused its discretion by admitting profile evidence. (*Robbie*, *supra*, at p. 1084; *Martinez*, *supra*, at p. 1006.) Both courts described profile evidence as "inherently prejudicial." (*Martinez*, at p. 1006; *Robbie*, at p. 1085.) Neither court addressed whether the evidence was irrelevant or lacked foundation, or whether the probative value of the evidence was outweighed by its prejudicial impact. (*Robbie*, at pp. 1084-1087; *Martinez*, at pp. 1005-1008.)

As the People correctly point out, *Robbie*, *supra*, 92 Cal.App.4th 1075, and *Martinez, supra*, 10 Cal.App.4th 1001, predate the Supreme Court's issuance of *Smith*, *supra*, 35 Cal.4th 334, in which the Court explained that profile evidence is not excludable per se but instead "is inadmissible *only if* it is either irrelevant, lacks a foundation, or is more prejudicial than probative." (*Smith*, *supra*, 35 Cal.5th at p. 357, italics added.) Two years later, in *Prince*, *supra*, 40 Cal.4th 1179, the Supreme Court quoted that passage from *Smith* and reiterated that "profile evidence does not describe a category of always-excluded evidence" but rather is subject to exclusion only if it meets the criteria set forth in *Smith*. (*Prince*, at p. 1226.)

Despite the Supreme Court's holding that profile evidence is not always inadmissible and its specification of the circumstances under which such evidence is inadmissible, Whitworth fails to make any argument that the evidence should have been excluded on any of those bases. In his reply brief, Whitworth acknowledges that *Smith*, *supra*, 35 Cal.4th 334 "tie[d]" profile evidence "to the Evidence Code section 352 test." But he still does not apply that test to this case, and he instead attempts to distinguish *Smith* on its facts and asserts that *Robbie*'s holding that "[p]rofile evidence is generally

11

inadmissible to prove guilt" (*Robbie*, *supra*, 92 Cal.App.4th at p. 1084) is still good law after *Smith*.

Whitworth's argument lacks merit. *Robbie* held that "[p]rofile evidence is generally inadmissible to prove guilt." (*Robbie*, *supra*, 92 Cal.App.4th at p. 1084.) *Smith* held that profile evidence "is inadmissible only if it is either irrelevant, lacks a foundation, or is more prejudicial than probative." (*Smith*, *supra*, 35 Cal.5th at p. 357.) Thus, under *Smith* and contrary to *Robbie*, classifying certain testimony as profile evidence is not sufficient to establish its inadmissibility. Rather, the testimony must still be shown to be inadmissible on some other ground, such as relevance, foundation, or prejudicial effect that outweighs its probative value. Whitworth did not object in the trial court to the admissibility of the profile evidence on any of those grounds, so he has forfeited any such objection. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1064.) Likewise on appeal, he does not argue that the evidence was irrelevant, lacking foundation, or more prejudicial than probative. He therefore has not shown that the evidence was inadmissible under *Smith*, by which we are bound. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

3. *Prejudice*

In addition, even if admission of the putative profile evidence was erroneous, any error was harmless. It is not reasonably probable that the jury would have reached a different conclusion on the pimping counts under section 266h, subdivision (b) (the only convictions Whitworth contends that the error affected), if the purported profile evidence

had been excluded.  (*People v. Leonard* (2014) 228 Cal.App.4th 465, 493 (*Leonard*); *People v. Watson* (1956) 46 Cal.2d 818, 836.)

The only arguable profile evidence admitted was Deputy Wolfe's testimony about Whitworth's Facebook page, because Deputy Wolfe opined that Whitworth's Facebook name and the symbol of a stack of money on his page were consistent with the language and symbols used by pimps.  That evidence arguably could be interpreted as commentary on Whitworth's guilt on the pimping charges.  (Cf. *Leonard*, *supra*, 228 Cal.App.4th at p. 493, fn. 9 [testimony regarding the defendant's social media postings or style mimicking that of a successful pimp not inadmissible profile evidence because the expert did not opine that the defendant was in fact a pimp because of that mimicry].)  The remainder of Deputy Wolfe's testimony—describing the characteristics of various types of pimps—did not constitute profile evidence at all, because Deputy Wolfe did not compare the behavior of Whitworth to the characteristics of any of the types of pimps and conclude that Whitworth fit the profile of that type of pimp.  (*Prince*, *supra*, 40 Cal.4th at p. 1226; *Leonard*, at p. 493 [expert's testimony about what type of pimp the defendant was "could reasonably be interpreted as unhelpful comments on [the defendant's] guilt or innocence on the charge of pimping"].)

Admission of the testimony about Whitworth's Facebook page could not have been prejudicial, both because it was brief and limited and because there was overwhelming evidence supporting the pimping convictions.  Doe testified that Whitworth told her to prostitute herself when she was 15 years old, taught her how to attract customers and how much to charge, provided her with condoms, and directed her

13

to give him the money she earned from prostitution. Doe told Deputy Wolfe that she worked as a prostitute for Whitworth for months after her 16th birthday. Doe described Whitworth's involvement in all of the varied ways in which she engaged in prostitution, including the bachelor party, walking the streets as a prostitute in San Bernardino and Los Angeles, working at the motel in Bakersfield, and advertising her services online. The online advertisement included Whitworth's phone number, and on Whitworth's computer law enforcement found the photographs used in the advertisement and an image with a disclaimer about prostitution services. In addition, during the pretext call, Whitworth indicated that he was interested in "get[ting] some money" with Doe and playing "the game" with her, which is a term that refers to prostitution. Given this ample evidence supporting the pimping convictions, it is not reasonably probable that the jury would have reached a different conclusion absent admission of the putative profile evidence.

B. *Multiple Convictions Under Section 266h*

Whitworth argues that pimping under section 266h "describes a continuing offense based on deriving support off of a person," so section 954 prohibits convicting him of two counts of pimping, one for acts occurring before Doe turned 16 and one for acts occurring after her 16th birthday. He contends that the conviction for pimping Doe after she turned 16 years should be reversed because the continuing offense began when she was 15 years old. Whitworth relies in part on the legislative history of section 266h. We are not persuaded.

14

Section 954 provides in pertinent part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . . The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged . . . ." As our Supreme Court has explained, under section 954 "'a defendant properly may be convicted of two offenses if neither offense is necessarily included in the other, even though under section 654 he or she could not be punished for more than one offense arising from the single act or indivisible course of conduct.'" (*People v. Vidana* (2016) 1 Cal.5th 632, 637 (*Vidana*).) Put another way, section 954 authorizes multiple convictions for "different offenses connected together in their commission" or "different offenses of the same class of crimes or offenses" (§ 954; *Vidana*, *supra*, at p. 650), but it "does not authorize multiple convictions for different statements of the same offense" (*Vidana*, at p. 651).

The issue we therefore must analyze under section 954 is whether the two counts for pimping a minor under section 266h, subdivision (b), are different statements of the same offense or different offenses. We independently review the propriety of multiple convictions under section 954. (*People v. Villegas* (2012) 205 Cal.App.4th 642, 646.)

Section 266h, subdivision (b), provides in pertinent part: "Any person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution . . . or who solicits or receives compensation for soliciting for the person, when the prostitute is a minor, is

15

guilty of pimping a minor, a felony . . . ."  "If the person engaged in prostitution is a minor 16 years of age or older, the offense is punishable by imprisonment in the state prison for three, four, or six years."  (§ 266h, subd. (b)(1).)  If the minor victim is younger than 16 years old, the offense is punishable in state prison for three, six, or eight years.  (§ 266h, subd. (b)(2).)

The age of the victim is an element of the offense, because the punishment differs depending on the victim's age.  Accordingly, the jury was instructed pursuant to CALCRIM No. 1150 (which Whitworth does not challenge) that one of the elements the People had to prove was that Doe was "under the age of 16 years when she engaged in the prostitution" for count 2 and "over the age of 16 years when she engaged in the prostitution" for count 3.

Because section 266h, subdivision (b), describes two distinct offenses, it does not matter whether section 266h is a continuing offense, as Whitworth contends.  A continuing violation of section 266h, subdivision (b)(1), ceases when the victim turns 16, and a continuing violation of section 266h, subdivision (b)(2), begins when the victim turns 16 and ends when the victim turns 18.  If the pimping continues after the victim turns 18, a continuing violation of section 266h, subdivision (a), begins at that time.  Section 266h therefore describes three separate offenses, depending on the victim's age.

Because Whitworth was convicted of two different offenses in counts 2 and 3, rather than two different statements of the same offense, those two convictions did not violate section 954.[1]

C. *Ability to Pay Hearing*

At sentencing, the court imposed $2,170 in court operations and facilities fees (§ 1465.8, subd. (a)(1); Gov. Code, § 70373, subd. (a)(1)), a $3,000 restitution fine (§ 1202.4, subd. (b)), and a suspended $3,000 parole revocation fine (§ 1202.45, subds. (b)-(c)). The court determined that Whitworth did not have the ability to pay the fees for his court-appointed counsel or the costs of the presentence probation report.

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which was decided several years after Whitworth was sentenced in December 2015, Whitworth argues that imposition of the court operations and facilities fees without a determination of his ability to pay violated his due process rights.[2] He also argues that the restitution fine should be stayed until the People demonstrate on remand that Whitworth has the ability to pay any fees and fines. We conclude that Whitworth has forfeited any

---

[1] We deny Whitworth's request for judicial notice of legislative history materials related to section 266h because they are irrelevant to our analysis.

[2] The Supreme Court has granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844 [2019 Cal. Lexis 8371], to decide whether a court is required to "consider a defendant's ability to pay before imposing or executing fines, fees, and assessments."

17

argument about the restitution fine and that any error with respect to the court operations and facilities fees was harmless.[3]

*Dueñas* held that defendants have a due process right under the federal and state Constitutions to a hearing on their ability to pay court operations and facilities fees. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) In addition, "to avoid serious constitutional questions" raised by the statutory restitution scheme, the court must stay execution of the mandatory restitution fine unless the court determines that the defendant has the ability to pay it. (*Id.* at p. 1172.) The same court that decided *Dueñas* has since clarified that, at the ability to pay hearing, the defendant bears the burden of showing his or her inability to pay, and the court "must consider all relevant factors," including "potential prison pay during the period of incarceration to be served by the defendant." (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490-491.) This court has held that defendants sentenced before *Dueñas* who did not raise the issue of ability to pay in the trial court did not thereby forfeit a due process challenge to a minimum restitution fine or to court operations and facilities fees. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1030-1035 (*Jones*).)

---

**3**      The People argue that the restitution fine is punitive in nature and should be analyzed under the Eighth Amendment's excessive fines clause, not the due process clause. The People contend that the restitution fine is constitutional under the excessive fines clause. Moreover, they argue that even if a due process analysis applies, the fine survives rational basis review and therefore is constitutional. We need not address those arguments, given our conclusion that Whitworth forfeited his argument about the restitution fine.

18

The holding does not apply, however, to a restitution fine greater than the minimum amount under section 1202.4, subdivision (b), which is what was imposed here. This court has held that a defendant forfeits this argument by failing to object to such a fine in the trial court or to request an ability to pay hearing. (*People v. Taylor* (2019) 43 Cal.App.5th 390, 399-400 (*Taylor*); *People v. Oliver* (2020) 54 Cal.App.5th 1084, 1102 [following *Taylor*].) The substantive law in existence when Whitworth was sentenced would have allowed the court to consider Whitworth's ability to pay the restitution fine. (*Taylor*, *supra*, at p. 399; § 1202.4, subd. (c).) Whitworth argues that *Taylor* was wrongly decided because the statutory provision merely allowed but did not require the trial court to consider a defendant's ability to pay, and the trial court could still impose the maximum fine even if the defendant was unable to pay. The argument lacks merit because it does not undermine *Taylor*'s holding concerning forfeiture—the governing law when Whitworth was sentenced allowed for consideration of ability to pay, so Whitworth forfeited the issue by failing to raise it. We therefore see no reason to depart from this court's recent precedent. (*Estate of Sapp* (2019) 36 Cal.App.5th 86, 109, fn. 9.) Because the trial court could have considered Whitworth's ability to pay a $3,000 restitution fine (§ 1202.4, subd. (c)), Whitworth's failure to object on that ground in the trial court forfeits the argument on appeal. (*Taylor*, at p. 401.)

With respect to the court operations and facilities fees, we conclude that any error in imposing those fees without an ability to pay hearing was harmless beyond a reasonable doubt. (*Jones*, *supra*, 36 Cal.App.5th at p. 1035.) "Ability to pay does not necessarily require existing employment or cash on hand" (*People v. Staley* (1992) 10

Cal.App.4th 782, 785), and "every able-bodied" prisoner must work while imprisoned. (§ 2700.) Wages in prison range from $12 to $56 per month, depending on the job and skill level involved. (Cal. Code Regs., tit. 15, § 3041.2, subd. (a)(1); see also Cal. Code Regs., tit. 15, § 3040, subd. (k) ["An inmate's assignment to a paid position is a privilege dependent on available funding, job performance, seniority and conduct"]; *People v. Cervantes* (2020) 46 Cal.App.5th 213, 229 [recognizing that an inmate's assignment to a paid position is a privilege].)

According to his probation report, Whitworth was 45 years old when he was sentenced, was working two jobs—one as a case manager and one as a night supervisor—and earning approximately $5,000 per month when he was arrested, was one course away from completing his master's degree coursework, and was in good physical and mental health without any physical limitations. In addition, on the pretext call with Doe, Whitworth said that he soon would be receiving a check in the amount of $23,000 for unpaid overtime wages.

Whitworth will owe approximately $2,170 in fees (as to which his challenges are not forfeited). Assuming that Whitworth earns the minimum monthly wage in prison ($12) and does not have any money added to his trust accounts, he will pay off that total amount in approximately 180 months or 15 years, which is just over half his sentence. We therefore conclude that the failure to conduct an ability to pay hearing for those fees was harmless beyond a reasonable doubt.

20

D. *Abstract of Judgment*

As the People correctly observe, the abstract of judgment does not include the court operations and facilities fees. We accordingly direct the trial court to correct the abstract of judgment to reflect the imposed fees of $1,240 for court operations (§ 1465.8, subd. (a)(1) [$40 each for 31 counts]) and $930 for court facilities (Gov. Code, § 70373, subd. (a)(1) [$30 each for 31 counts]). (*People v. Mitchell* (2001) 26 Cal.4th 181, 184-185.)

## DISPOSITION

The trial court is directed to correct the abstract of judgment to include the imposed fees of $1,240 under section 1465.8, subdivision (a)(1), and $930 under Government Code section 70373, subdivision (a)(1). The court is directed to forward a copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

MILLER
Acting P. J.

CODRINGTON
J.

21