Filed 8/28/23  P. v. Johnson CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>DONAVAN WAYNE JOHNSON,<br><br>　　Defendant and Appellant. | H049257<br>(Monterey County<br>Super. Ct. No. 18CR010752)<br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br><br>**NO CHANGE IN JUDGMENT** |

　　　　It is ordered that the opinion filed herein on August 2, 2023, be modified as follows:

　　　　　　On page 30, at the end of the third full paragraph, insert the following footnote:

　　　　In a petition for rehearing, Johnson seeks rehearing on the ground the court failed to specifically address his related argument that the trial court erred by imposing upper terms based on facts that were already used to enhance his punishment, citing section 1170, subdivision (b)(5).  Trial counsel failed to raise this objection at Johnson's sentencing hearing and the argument is forfeited.  "[C]omplaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal."  (*People v. Scott* (1994) 9 Cal.4th 331, 356 (*Scott*).)  Forfeiture will apply to "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices," including "cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or to give a

sufficient number of valid reasons." (*Id*. at p. 353.) Even if Johnson did not forfeit this argument, however, it is without merit. There can be no doubt Johnson inflicted harm on K.R. well in excess of that which would support his convictions and the true findings on the charged enhancements. "[T]he use of force or fear beyond that which is necessary for the accomplishment of the defendant's criminal purpose may be considered as a factor in aggravation." (*People v. Reeder* (1984) 152 Cal.App.3d 900, 922.)

There is no change in the judgment. Appellant's petition for rehearing is denied.


_____
Wilson, J.


_____          _____
Bamattre-Manoukian, Acting P.J.             Danner, J.

Filed 8/2/23  P. v. Johnson CA6 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DONAVAN WAYNE JOHNSON,<br><br>    Defendant and Appellant. | H049257<br>(Monterey County<br>Super. Ct. No. 18CR010752) |

A jury convicted defendant Donavan Wayne Johnson of multiple offenses, including one count of torture, after he repeatedly slashed and stabbed the mother of his children with a box cutter.  The trial court sentenced him to life in prison plus 11 years and four months.

On appeal, Johnson raises the following arguments related to his convictions: (1) there was insufficient evidence to support his conviction for torture; (2) the trial court erred in admitting expert testimony on intimate partner violence; (3) the trial court misinstructed the jury on the crime of torture; (4) the cumulative effect of the errors warrants reversal; and (5) he cannot be convicted for violating both Penal Code section 245,[1] subdivision (a)(1) and subdivision (a)(4).

Johnson also raises multiple issues regarding his sentencing:  (1) the trial court misapplied section 654 with respect to several counts; (2) he is entitled to resentencing as a recent amendment to section 654 gives the trial court discretion to stay a longer term as

_____

[1] Unspecified statutory references are to the Penal Code.

opposed to a lesser term; (3) he is entitled to resentencing because the trial court no longer has the authority to impose an upper term sentence unless a jury has found true the aggravating circumstances; (4) his one year term for misdemeanor child endangerment was unauthorized; (5) the record must be corrected to reflect that the trial court did not impose a fine under section 1202.5; and (6) at resentencing, the trial court must consider dismissing enhancements under recent amendments to section 1385.

For the reasons explained below, we will reverse the judgment for the limited purpose of resentencing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Procedure*

On March 1, 2021, the Monterey County District Attorney filed an amended information charging Johnson with attempted premeditated murder (§§ 664, 187, subd. (a); count 1); aggravated mayhem with an enhancement for personal use of a deadly weapon (§§ 205, 12022, subd. (b)(1); count 2); torture (§ 206; count 3); attempted kidnapping with an enhancement for great bodily injury involving domestic violence (§§ 664, 207, subd. (a), 12022.7, subd. (e); count 4); domestic violence with enhancements for personal use of a deadly weapon and inflicting great bodily injury (§§ 273.5, subd. (a), 12022, subd. (b)(1), 12022.7, subd. (e); count 5); assault with force likely to cause great bodily injury with an enhancement for inflicting great bodily injury (§§ 245, subd. (a)(4), 12022.7, subd. (e); count 6); first degree burglary (§§ 459, 460, subd. (a), 462, subd. (a); count 7); misdemeanor child endangerment (§ 273a, subd. (b); count 8), and assault with a deadly weapon with an enhancement for inflicting great bodily injury (§§ 245, subd. (a)(1), 12022.7, subd. (e); count 9).

At the conclusion of the trial, the jury found Johnson not guilty of attempted murder (count 1), aggravated mayhem (count 2), attempted kidnapping (count 4), and first degree burglary (count 7). The jury convicted Johnson of torture (count 3), domestic violence (count 5), assault with force likely to produce great bodily injury (count 6), child

endangerment (count 8), assault with a deadly weapon (count 9), the lesser included offense of simple mayhem (count 2), and the lesser included offense of attempted false imprisonment (count 4). The jury also found true the enhancements for personal use of a deadly weapon and infliction of great bodily injury on all the associated counts on which Johnson had been convicted, i.e., the lesser included offense of simple mayhem (count 2), domestic violence (count 5), and assault with force likely to produce great bodily injury (count 6).

On July 1, 2021, the trial court sentenced Johnson to a life term for torture (count 3).[2] The court also imposed a consecutive determinate term of 11 years and four months, consisting of the upper term of four years for domestic violence (count 5) plus five years for the great bodily injury enhancement, one year for the deadly weapon enhancement, four months (one-third the middle term of one year) for attempted false imprisonment (count 4) and 364 days for misdemeanor child endangerment (count 8).

Pursuant to section 654, the court imposed and stayed the following terms: (1) an upper term of eight years for simple mayhem plus one year for personal use of a weapon (count 2); (2) an upper term of four years for assault with force likely to cause great bodily injury, plus five years for the inflicting great bodily injury (count 6); and (3) an upper term of four years for assault with a deadly weapon (count 9).

The trial court imposed a $5,000 restitution fund fine (§ 1202.4, subd. (b)), a parole violation restitution fund fine of $5,000 (§ 1202.45) (stayed pending successful completion of parole), $3,583.53 in victim restitution (§ 1202.4, subd. (f)), a $280 court operations assessment (§ 1465.8, subd. (a)(1)), and a $210 court facilities assessment (Gov. Code, § 70373).

Johnson timely appealed.

---

[2] Pursuant to section 3046, Johnson will be eligible for parole after seven years, so his term is "seven years to life."

### B. Facts

#### 1. Prosecution case

At approximately 11:00 a.m. on November 12, 2018, Salinas Police Officer James Knowlton responded to a report of a domestic disturbance in the City of Salinas. On the way, Knowlton saw a vehicle described as belonging to the suspect driving away from the scene. When Knowlton activated his lights and siren, Johnson began driving erratically, running two red lights, before stopping in front of the emergency department at Natividad Medical Center. Johnson got out of the car and stood next to it. Knowlton pointed his firearm at Johnson and ordered him to get on the ground, but Johnson was uncooperative. Knowlton repeated his command three or four times before Johnson ultimately complied. Johnson was agitated and said something about his passenger needing help. As Knowlton and another officer handcuffed Johnson, Knowlton saw K.R. sitting in the passenger seat, bleeding from a cut on her forehead. After hospital personnel took K.R. inside, Knowlton searched the vehicle and saw a black box cutter on the center console.

Salinas Police Officer Joseph Kinney also responded to the domestic disturbance report and, on his arrival at Natividad Medical Center, he observed other officers taking Johnson into custody. Kinney approached Johnson's vehicle and saw K.R. in the passenger seat. K.R. was bleeding "profusely" from a "pretty deep" cut on her forehead. K.R. told Kinney she had cuts to her legs as well and Kinney did not think she could walk on her own. Emergency room personnel came out and took her inside for treatment. Kinney followed, and the video, including audio, from his body camera was played for the jury. Photographs of K.R.'s wounds when she was in the hospital were admitted into evidence and showed cuts on her forehead, near her left ear, on her right arm, and on both legs.

An investigator for the district attorney, Tim Willmore, went to see K.R. while she was at the hospital. K.R. was in a wheelchair, with her left leg immobilized and extended

4

in a brace. He observed that the cut on her forehead was, in his estimation, three to three-and-a-half inches in length. He described the other cuts near her ear and arm as being between two and three inches long. Willmore noted that K.R. had a defensive wound on the webbing of her right hand, between her thumb and index finger. When Willmore saw K.R. again in December 2018, she could walk slowly, with a limp, and had difficulty moving her left leg which was still in a brace.

Over two years later, in February 2021, Isabelle Diaz, also an investigator with the district attorney's office, visited K.R. at the clothing store where she was working. K.R. was sitting behind a partition so Diaz could not tell if she continued to have trouble walking or if she had a cane or other assistive device. However, K.R. had a visible scar running from the top of her forehead down toward her right ear.

K.R.'s 911 call was played for the jury, although she did not testify.[3] In that call, K.R. told the dispatcher she was at home along with her grandmother, her great grandmother, and her children. She said Johnson, her "ex-boyfriend," had messaged her saying he would break in the house and now he had arrived. K.R. reported that he had gotten out of his vehicle, jumped over a fence, and entered the house. Johnson could be heard telling K.R. that she was "get[ting] on [his] fucking nerves!" He then yelled "Get in (unintelligible) my fuckin' car!" Johnson told K.R. "All you have to do is . . . talk to me," after which a child could be heard yelling "Let her go!" and "Stop!" several times. K.R. and her grandmother could also be heard yelling at Johnson to stop and to let K.R. go. Johnson asked K.R. if she "want[ed] to press charges" and "you think I'm fucking with you, huh? . . . You thinking you can fuck with them?" Johnson said, "now I gotta

---

[3] It is not clear why K.R. did not testify, but she failed to appear on the first day of jury voir dire. At the prosecutor's request, the court issued an order to show cause (OSC) as to why it should not hold K.R. in contempt. On the second day of jury voir dire, the prosecutor asked that the court vacate the OSC, noting that K.R. appeared that day. The prosecutor stated that if K.R. voluntarily appeared to testify at trial, she would decide at that time whether to call her as a witness. During the prosecutor's opening statement, she informed the jury that K.R. would not testify, but the jurors would hear the 911 call.

5

go to jail." K.R.'s grandmother said she had the kids, as K.R. could be heard screaming. Johnson repeated "Let's go!" followed by "I swear I'll start cutting her ass too . . . Let's go!"

Johnson told K.R. there was something "all over you [i.e., K.R.]." K.R. said repeatedly she did not want to go, and Johnson replied, "No, fuck that I'm not messin' with you no more. No 'cause you ignore me every fuckin' time. Fuck, no! Let's go!" When K.R. continued to refuse, Johnson said, "I'll cut your ass some more then." Johnson said that he did not care about going to jail, "I don't give a fuck. Your legs are open. Like open—open—open look. Look at your fuckin' leg. No, you gonna fuckin' die like seriously you don't listen." Just before the call ended, K.R. told Johnson, "No, go away run. Run."

After the incident, investigating officers went to the residence and photographed blood trails and droplets both inside the house and on the driveway.

The prosecution introduced a recorded jail call from Johnson to his mother. In that call, Johnson said he knew that K.R. was "fine," but he was worried about the children. Johnson said he did not care if K.R. was seeing anyone else, but her staying out late and being absent from the house was affecting the children. He criticized K.R. for seeing another man, letting that man drive the car that Johnson left for K.R., and having that man take care of the children while K.R. was at work. Johnson referred to this man as "the dude . . . that caused all this" and said "if [K.R.] wasn't fuckin' with this dude that night we woulda never had no argument. . . . It woulda never came to this." Later in the conversation, Johnson told his mother, "My life has to get taken away 'cause of this dude."

Dr. Mindy Mechanic testified as an expert on victim partner abuse. Dr. Mechanic said that such abuse involves a pattern of behavior that can include physical violence, as well as emotional/psychological abuse. The abuser will often quickly shift from being violent toward the victim to being loving and kind, which is confusing to the victim. The

6

abuser also often blames the victim, and victims often blame themselves for the violence, going so far as to protect the abuser. A victim is at most risk of escalated, possibly lethal, violence in the period just before, during, or in the months after separating from the abuser. In Dr. Mechanic's opinion, abusers offer many different excuses for their conduct, such as financial stress or housing insecurity, but those stressors are not causal. Dr. Mechanic confirmed that she was not aware of the facts involved in this particular case, had not reviewed any of the evidence, and did not know either K.R. or Johnson.

## 2. Defense case

### a. Johnson's testimony

Johnson testified he and K.R. started dating during their senior year in high school and had four children together. At the time of trial, their oldest child was 11 and the youngest was three years old. Before the incident, the family became homeless and stayed in various places, including K.R.'s mother's home. Johnson and K.R. broke up in August 2018.

On Friday, November 10, 2018, Johnson traveled to Arizona with the children but not K.R. Over the next three days,[4] Johnson slept very little. During the drive back to Salinas, Johnson communicated with K.R. on the phone and via text messages, discussing whether they would get back together. Johnson began thinking about killing himself, and during a restroom stop, he purchased a box cutter at the gas station in order to slash his wrist.

Johnson arrived in Salinas with the children around 3:00 or 4:00 a.m. He and K.R. talked in the living room and in the garage area about their relationship and his thoughts of suicide. Johnson went outside and slept in his car for an hour before heading to work around 6:00 a.m. the next day.

---

[4] Johnson was not asked what day he returned to Salinas, but the incident occurred on November 12 which is only two days after he drove to Arizona.

Johnson later contacted K.R. and, on learning she planned to take a taxi to work, Johnson offered to drive her there instead. When he arrived at her house, K.R. said she did not want a ride which confused him. Johnson decided he would leave with the children, so he placed them in his car. However, after around five minutes, Johnson took the children back inside and drove back to work.

After work, Johnson went back to K.R.'s house to talk to her, but the front door was locked. Johnson heard K.R. tell their son not to open the door, so he jumped over the fence to the backyard and came through a window. Johnson testified that he was sleep-deprived, and was feeling depressed, angry, and suicidal. When he saw K.R., Johnson yelled at her, and she yelled back at him. Johnson said that K.R.'s godmother and her grandmother were also yelling, so he grabbed K.R. by her sweater and tried to take her outside, "away from all the confusion."

As Johnson was pulling K.R. toward the front door, she was able to stop her momentum and punched him in the genitals, stomach, and face. K.R. grabbed and twisted his testicles, at which point, Johnson "lost it." He took the box cutter out of his pocket and swung it at K.R., three or four times. Johnson did not intend to cut her and was not aware that he had done so at first. Johnson stopped when he saw "blood coming down her face." Johnson was still agitated and yelling, but he tried to tell K.R. he needed to get her to the hospital. K.R. kept telling him it was not serious and that Johnson should run.

Johnson told K.R. she needed to stop fighting him about going to the hospital, but it was only after he told her "I'll cut your ass some more" that she realized the seriousness of her injuries. When Johnson said her leg was "[cut] open," she started to "freak." He then picked her up and put her in his car. Johnson grabbed some towels to wrap around her legs to stop the bleeding, then drove toward Natividad Medical Center. On the way, Johnson noticed that the police were following him, with their lights and sirens. Because K.R. needed help, he did not stop and even ran two stop signs and a red

8

light to get K.R. to the hospital as quickly as possible. Johnson did not know the extent of K.R.'s injuries until six months later when he saw the photos of her wounds.

Johnson testified that he was not disputing that he assaulted K.R., committed an act of domestic violence, and inflicted great bodily injury on her. However, Johnson denied that he had any plan to kill, disable, or disfigure her or that he intended to cause her great pain and suffering as an act of revenge. Johnson was more than a foot taller than K.R.[5] and much stronger physically. Johnson testified that he did not act out of jealousy that night, as he and K.R. had been with other people in the past.

Johnson admitted that, since he has been in custody, he was involved in two fights and, in the latter incident, threatened a correctional officer. In the first fight, Johnson and six other inmates attacked a second group of six inmates. Johnson punched one inmate in the head, pushed another to the ground, and kicked a third inmate in the head. In the second fight, Johnson punched another inmate in the face several times, and then threatened a deputy sheriff who responded to the incident.

### b. *Other defense evidence*

Lynda Gates, a defense investigator, testified that she met K.R. on November 30, 2020, at the restaurant where K.R. worked as a waitress. Gates observed that K.R. did not have a limp while walking, nor did she use a cane.

Merriam Young, a critical care registered nurse, testified as an expert in interpreting medical records and "explanation[s] of traumatic injuries." In preparing for her testimony, Young reviewed K.R.'s medical records as well as the photographs of K.R.'s injuries. Young noted that, when she arrived at the hospital, K.R.'s heart rate was high and her blood pressure was low, both of which were triggered by blood loss. K.R. was given a blood transfusion to prevent her from going into shock, which would have impaired major organs and would potentially be fatal. According to the medical records,

---

[5] Johnson testified that he is six foot four inches tall whereas K.R. is either five or five foot one inches tall.

K.R. had seven cuts that were sutured but did not require surgery: a three-centimeter laceration near her left temple, a four-centimeter cut on the left side of her scalp, an eight-centimeter cut on her forehead that was deeper and required more than one layer of sutures, a four-centimeter cut on her arm, a cut on the webbing of her left hand between her thumb and index finger, a 15-centimeter laceration on her left shoulder that required multiple layers of sutures, and a 10-centimeter cut on her left knee which also required more than one layer of sutures. One of the lacerations went into K.R.'s left knee and an orthopedic surgeon repaired her lateral-collateral ligament, lateral meniscus, as well as a perineal nerve. On K.R.'s right leg, the orthopedic surgeon repaired a quadriceps muscle that attaches to the outside of the knee and K.R.'s hamstring tendon.

### 3. *Prosecution rebuttal*

Leslie Chiang, a trauma nurse, acted as a scribe during K.R.'s treatment in the emergency room at Natividad Medical Center. K.R.'s injuries when she arrived were potentially fatal because of the nature of the wounds and her vital signs. Chiang testified that if someone's perineal nerve is severed, they would be unable to lift their foot. Chiang also said that a cut hamstring makes it impossible to walk and, even after the hamstring is repaired, a person would require extensive rehabilitation to be able to walk again.

## II. DISCUSSION

### A. *Sufficiency of the evidence supporting torture conviction*

Johnson advances two arguments to support his position that the evidence presented at trial was insufficient to support his torture conviction. First, he argues that voters[6] intended section 206 to apply to only the most violent, heinous, and callous

---

[6] Section 206 was adopted by the California electorate in June 1990 as part of Proposition 115, also known as the "Crime Victims Justice Reform Act." (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 340.) Proposition 115's "stated general purpose [was] to adopt 'comprehensive reforms . . . needed in order to restore balance and fairness to (continued)

conduct, and that the evidence was insufficient to show that his conduct met those criteria. Second, Johnson argues that, even under a broader construction of section 206, the evidence was insufficient. We disagree with both arguments.

### 1. *Applicable legal principles*

In considering a claim of insufficient evidence, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054.) "Simply put, if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Farnam* (2002) 28 Cal.4th 107, 143 (*Farnam*).)

Section 206 provides, " 'Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. [¶] The crime of torture does not require any proof that the victim suffered pain.' " The crime of torture has two elements: "(1) a person inflicted great bodily injury upon the person of another, and (2) the person inflicting the injury did so with specific intent to cause cruel and extreme pain and suffering for the

---

our criminal justice system.' " (*Ibid.*) To that end, "the measure adopt[ed] a variety of changes and additions to our state Constitution and statutes" (*id.* at p. 342), including section 206, which defined the crime of torture, and section 206.1, which prescribed its punishment. (*People v. Barrera* (1993) 14 Cal.App.4th 1555, 1559.)

11

purpose of revenge, extortion, persuasion, or for any sadistic purpose." (*People v. Baker* (2002) 98 Cal.App.4th 1217, 1223.) Evidence of intent to cause cruel or extreme pain and suffering, like other forms of intent, is usually circumstantial. (*People v. Pre* (2004) 117 Cal.App.4th 413, 419-420 (*Pre*).)

"The torture offense contained in section 206 was adopted by the voters to 'fill[] a gap in existing law dealing with extremely violent and callous criminal conduct.' [Citation.] '[T]orture as defined in section 206 focuses on the mental state of the perpetrator and not the actual pain inflicted.' " (*Pre*, *supra*, 117 Cal.App.4th at pp. 419-420.) Accordingly, a defendant need not inflict "permanent, disabling, or disfiguring injuries" on the victim in order to violate the statute, as " '[s]ection 206 only requires "great bodily injury as defined in Section 12022.7." ' " (*Id.* at p. 420.) Nor does the statute " 'require any proof that the victim suffered pain.' (§ 206.) The statutory requirement of an intent to inflict 'cruel' pain and suffering has been interpreted to require that the defendant had an intent to inflict extreme or severe pain." (*Ibid.*)

Furthermore, unlike the intent required to convict a defendant of murder by torture, "section 206 does not require that the defendant act with premeditation or deliberation or that the defendant have an intent to inflict *prolonged* pain." (*Pre*, *supra*, 117 Cal.App.4th at p. 420.) As a result, "the brevity of the attack does not, in and of itself, compel a conclusion the defendant must be acquitted of torture." (*Ibid.*) Likewise, " '[s]everity of a victim's wounds is not necessarily determinative of intent to torture' since '[s]evere wounds may be inflicted as a result of an explosion of violence [citations] or an "act of animal fury" ' rather than an intent to inflict pain for revenge, extortion, persuasion, or other sadistic purpose." (*Id.* at pp. 420-421.)

### 2. *Voters intended section 206 to proscribe this type of conduct*

We first address Johnson's claim that the voters, in adopting section 206, did not intend that the type of conduct at issue in this case would qualify as torture under the statute. In support of this argument, Johnson notes that section 206 was enacted in

12

response to the fact that the defendant in *People v. Singleton* (1980) 112 Cal.App.3d 418, who had committed horrific crimes,[7] was released on parole after serving only seven years of his total sentence of 14 years and four months. (*Pre*, *supra*, 117 Cal.App.4th at p. 425.) In his view, the voters intended section 206 to apply only to such heinous and appalling conduct, not to convert all acts of aggravated assault into torture. Johnson cites Justice McIntyre's concurring and dissenting opinion in *Pre*, *supra*, 117 Cal.App.4th at page 426, specifically his critique that "application of [section 206] has expanded, by judicial accretion, to any assault in which the victim suffers 'great bodily injury' where the jury infers an intent to inflict cruel and extreme pain, regardless of whether the assailant's conduct was extremely violent and callous[,] [citations]" thus subjecting a defendant "to a life sentence rather than a two- to four-year sentence applicable to an aggravated assault conviction [citation], even if the crime was not particularly heinous and the injuries were not particularly substantial." (*Ibid*.)

"In interpreting a voter initiative . . . , we apply the same principles that govern statutory construction. [Citation.] Thus, 'we turn first to the language of the [initiative], giving the words their ordinary meaning.' [Citation.] The [initiative's] language must also be construed in the context of the statute as a whole and the [initiative's] overall . . . scheme." (*People v. Rizo* (2000) 22 Cal.4th 681, 685.) "Absent ambiguity, we presume that the voters intend the meaning apparent on the face of an initiative measure [citation] and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language." (*Lesher Communications*, *Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 543.)

We agree with the majority opinion in *Pre* that Johnson's argument is meritless: "[The] characterization [in the dissent] disregards the fact that for a torture conviction the

---

[7] *Singleton* kidnapped and brutally sexually assaulted a 15-year-old girl before using a hatchet to cut off both her hands and push her into a culvert. (*People v. Singleton*, *supra*, 112 Cal.App.3d at pp. 421-422.)

jury must not only find the defendant inflicted great bodily injury *but also that the defendant intended to do so for the purpose of revenge, extortion, persuasion, or some other sadistic purpose. This additional intent requirement distinguishes the offense of torture from an aggravated assault and is clearly a matter for a jury to determine.*" (*Pre, supra*, 117 Cal.App.4th at p. 423, italics added.) Had the voters intended to require that section 206 only apply to "particularly heinous" crimes and "particularly substantial" injuries, they could have so provided when enacting section 206. They did not. The plain language of the statute does not require that the prosecutor prove the defendant inflicted any specific injury or even that the victim suffered pain as a result. Consequently, Johnson's actions in this case fall within the parameters of section 206.

### 3. *Sufficient evidence Johnson tortured K.R*.

In his second insufficiency of the evidence argument, Johnson contends there was insufficient evidence to show that he acted with the requisite "intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (§ 206.) Johnson claims that his actions could not "lead to a reasonable inference that he specifically intended to inflict cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose" because he "never subdued K.R. or changed the purpose of the attack to a robbery or other purpose[;]" and the attack "was an indiscriminate explosion of anger that lasted about three or four minutes." We disagree.

As noted above, evidence of the intent to cause cruel or extreme pain and suffering is usually circumstantial. (*Pre, supra*, 117 Cal.App.4th at pp. 419-420.) "Intent is a state of mind. A defendant's state of mind must, in the absence of the defendant's own statements, be established by the circumstances surrounding the commission of the offense." (*People v. Mincey* (1992) 2 Cal.4th 408, 433.)

Johnson seeks to distinguish the facts of his case from those in *People v. Hale* (1999) 75 Cal.App.4th 94, 106-107 (defendant hit victim in the head with a hammer as

14

part of six-month campaign of terror), *People v. Quintero* (2006) 135 Cal.App.4th 1152, 1163 (defendant held victim's head while deliberately carving her face), and even *Pre*, *supra*, 117 Cal.App.4th at pages 422 through 423 (defendant, during robbery, strangled victim into unconsciousness, then bit and strangled her again though she had stopped resisting). The facts of those cases are different from the evidence presented to the jury in this case, but that does not mean that this jury could not reasonably infer from that evidence Johnson's intent to "cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (§ 206.) Having argued repeatedly with K.R. over the past few days regarding, among other things, her relationship with another man, Johnson went to her home armed with a boxcutter. In the 911 call, the jury heard K.R. and others screaming and calling out for Johnson to stop as he repeatedly slashed her on the face, arms, legs, and back. The jury observed photographs of the injuries, several of which were deep enough to require multiple layers of stitches, as well as surgeries to repair damage to K.R.'s left knee, right quadriceps, right hamstring, and her perineal nerve. The jury also heard that K.R. had lost so much blood due to her wounds that she required an infusion of blood to prevent her from going into shock and possibly dying. Finally, the jury heard Johnson's testimony about the attack and obviously did not believe he lacked the intent to torture K.R.

Johnson repeatedly notes his attack was brief, perhaps three or four minutes in length, but it is clear that "the brevity of the attack does not, in and of itself, compel a conclusion the defendant must be acquitted of torture." (*Pre*, *supra*, 117 Cal.App.4th at p. 420.)

We are also not persuaded that Johnson's acquittal by the jury of attempted murder and aggravated mayhem necessarily demonstrated that he lacked the intent to torture K.R. As Johnson admits, those crimes require entirely different intents, i.e., an intent to kill or maim K.R., whereas torture requires an intent to "cause cruel or extreme

15

pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (§ 206.)

Finally, the fact that Johnson drove K.R. to the hospital for treatment is not dispositive of his intent to torture her *at the time he was slashing her repeatedly with the boxcutter*. The jury obviously discounted Johnson's conduct following his assault on K.R. in reaching its verdict, and we defer to the jury's conclusions in assessing the import of those actions. (*Farnam*, *supra*, 28 Cal.4th at p. 143.)

Accordingly, we conclude sufficient evidence supports Johnson's conviction for the crime of torture.

### B. *No error in admitting expert testimony on intimate partner violence*

Johnson claims the court erred in allowing expert testimony regarding intimate partner violence. Specifically, Johnson contends that the expert's testimony was both inadmissible under Evidence Code section 1107 and unduly prejudicial because it described the behavior of abusers not victims. He also argues the expert's testimony constituted improper profile evidence, thereby also violating his due process rights.

Alternatively, Johnson argues that, in the event the court concludes trial counsel failed to raise an appropriate objection to this testimony, his trial counsel was constitutionally ineffective. We disagree that the trial court erred in admitting the expert testimony at issue and further conclude there was no ineffective assistance of counsel.

### 1. *Additional background*

The prosecutor moved in limine to present expert testimony from Dr. Mechanic on victim partner abuse, specifically to explain how victims of domestic violence can act in ways that are contrary to how one would expect a crime victim to behave. The prosecutor stated she intended to elicit testimony from Dr. Mechanic that: (1) abusers' behavior will sometimes change suddenly from peaceful to violent but will sometimes come about through a gradual buildup of anger; (2) abusers often blame their victims for

the violence or abuse; and (3) victims are at most risk of escalated, potentially fatal, violence just before, during, or in the months after separating from the abuser.  Defense counsel objected to the first two areas of testimony on foundational grounds,[8] but not the third.[9]  The trial court ruled that Dr. Mechanic could offer testimony on victims' counterintuitive behavior, such as trying to protect the abuser, or an abuser suddenly switching from violent to loving behavior, as well as how abusers often blame the victim for the domestic violence and that victims are at greatest risk of elevated levels of violence around the time of a separation from their abuser.

At trial, Dr. Mechanic testified that domestic violence offenders tend to switch quickly from being peaceful to violent, but there can also be a slow burn "where . . . anger slowly build[s]."  She further testified that it is common for offenders to be violent one moment and peaceful, loving, and caring the next, which is "really confusing" to the victim.

Dr. Mechanic testified it is "very, very common for the victim to be blamed [by the abuser]," and the most lethal time in a relationship is around the period of separation. Abusers' tactics vary, and do not follow a pattern of behavior; instead, the only pattern is the continuity of abuse over time.

Dr. Mechanic also testified she did not know anything about the facts of the case, the relationship of the parties, or the charges against Johnson.  The prosecutor did not ask her to try to correlate her generalized testimony about victim partner abuse to any of the specific facts involved in this case.

---

[8] In defense counsel's view, the testimony lacked foundation because there was no evidence Johnson committed domestic violence before this incident.

[9] Defense counsel indicated that Johnson would testify that he and K.R. "had . . . broken up in August [2018]" but "were reuniting" and living together "within two weeks of this incident."  Later, however, defense counsel clarified that it was objecting to "any of [the testimony] coming in on the basis of foundation, and that there's not even one prior incident [of domestic violence] that's going to be coming into evidence."

17

Immediately following Dr. Mechanic's testimony, and again at the close of evidence, the court instructed the jury that Dr. Mechanic's testimony was not evidence that Johnson committed any of the charged crimes, and that the jury could consider her testimony only to determine if K.R.'s conduct was inconsistent with the conduct of someone who has been abused.

### 2. *Applicable legal principles*

Evidence Code section 1107 specifically addresses expert testimony on intimate partner battering: "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (*Id*., at subd. (a).) Subdivision (b) of that section further provides, in part: "The foundation shall be sufficient for admission of this expert testimony if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness."

A trial court's admission of expert testimony should not be reversed "absent a clear showing of an abuse of discretion." (*People v. Johnson* (1993) 19 Cal.App.4th 778, 790.) Similarly, "[t]he qualification of expert witnesses, including foundational requirements, rests in the sound discretion of the trial court. [Citations.] That discretion is necessarily broad: 'The competency of an expert "is in every case a relative one, i.e., relative to the topic about which the person is asked to make his statement." [Citation.]' [Citation.] Absent a manifest abuse, the court's determination will not be disturbed on appeal." (*People v. Ramos* (1997) 15 Cal.4th 1133, 1175 (*Ramos*).)

Testimony from an expert or witness which could otherwise be considered a criminal "profile" requires additional consideration by the trial court. "A profile ordinarily constitutes a set of circumstances—some innocuous—characteristic of certain

18

crimes or criminals, said to comprise a typical pattern of behavior. In profile testimony, the expert compares the behavior of the defendant to the pattern or profile and concludes the defendant fits the profile." (*People v. Prince* (2007) 40 Cal.4th 1179, 1226.) "[P]rofile evidence does not describe a category of always-excluded evidence; rather, the evidence ordinarily is inadmissible 'only if it is either irrelevant, lacks a foundation, or is more prejudicial than probative.' [Citation.] In sum, '[p]rofile evidence is objectionable when it is insufficiently probative because the conduct or matter that fits the profile is as consistent with innocence as guilt.' " (*Ibid.*) "By contrast, background testimony is not 'profile' evidence and does not specifically address the guilt or innocence of the defendant. Instead, it enables the jury to understand other evidence that does address guilt or innocence." (*People v. Lopez* (1994) 21 Cal.App.4th 1551, 1556.) For example, evidence that there is no commonality among offenders is not profile evidence and is therefore admissible. (*People v. Robbie* (2001) 92 Cal.App.4th 1075, 1089 (*Robbie*).)

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) A trial court has broad discretion in determining whether to admit or exclude evidence under this section (*Ramos*, *supra*, 15 Cal.4th at p. 1170), and a court's rulings under Evidence Code section 352 will not be overturned absent an abuse of that discretion. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.)

Any error in admitting expert testimony is evaluated for prejudice under *Watson*[10] and will be reversed only where it is " 'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 247 (*Prieto*).)

---

[10] *People v. Watson* (1956) 46 Cal.2d 818.

19

### 3. *The expert testimony was admissible*

Johnson claims that Dr. Mechanic's testimony was inadmissible profile evidence. In his view, the evidence was offered to show how an abuser acted, rather than to explain a victim's counterintuitive behavior. We disagree.

In sum, there are three areas of intimate partner violence that Dr. Mechanic discussed in her testimony: (1) abusers often blame the victim for the violence and abuse; (2) abusers can quickly shift from physical violence and emotional abuse to demonstrating love and affection, which confuses the victim; and (3) the most dangerous time for a victim is the period surrounding a victim's attempt to separate from the relationship. Dr. Mechanic's testimony about these concepts did not constitute profile evidence. Instead, this testimony helped the jury understand why a victim might stay with or even try to protect an abuser, rather than leave them or ensure their prosecution.

Johnson relies principally on *Robbie*, *supra*, 92 Cal.App.4th 1075, but that case is distinguishable. In *Robbie*, the expert witness was offered to testify " 'in the area of the behaviors and conduct of persons who commit sexual assaults.' " (*Id*. at p. 1082.) According to the expert, the defendant's behavior, as described by the prosecutor's hypotheticals which closely matched the facts of the case, was the " 'most prevalent type of behavior that I've seen with sex offenders.' " (*Id*. at p. 1084.)

The *Robbie* court concluded that this testimony was improper "inherently prejudicial" profile evidence "because it requires the jury to accept an erroneous starting point in its consideration of the evidence." (*Robbie*, *supra*, 92 Cal.App.4th at p. 1085.) The expert "was asked hypothetical questions assuming certain behavior that had been attributed to the defendant and was allowed to opine that it was the most prevalent kind of sex offender conduct. The jury was invited to conclude that if defendant engaged in the conduct described, he was indeed a sex offender." (*Ibid*.)

Here, in contrast, the prosecutor did not ask Dr. Mechanic *any* hypothetical questions which would demonstrate that Johnson matched the profile of someone who

20

engages in intimate partner violence. The testimony was not impermissible profile evidence as it "was not offered to establish a stereotype, then condemn the defendant for fitting it." (*Robbie*, *supra*, 92 Cal.App.4th at p. 1087.)

*People v. Yang* (2021) 67 Cal.App.5th 1, is also distinguishable. In that case, the court found that the trial court erred in two ways: (1) permitting expert testimony regarding postpartum depression and psychosis as evidence of defendant's guilt when defendant had not been diagnosed with a postpartum mental condition; and (2) allowing the prosecution to use defendant's privileged psychotherapy records. (*Id*. at p. 51.) The court reversed the judgment due to the cumulative nature of these errors. (*Ibid*.)

Here, Dr. Mechanic's testimony about intimate partner violence was supported by the underlying facts and at no time did the prosecution ask Dr. Mechanic to connect the specifics of the case with her testimony. Unlike in *Yang*, Dr. Mechanic's testimony provided appropriate contextual information to assist the jurors in understanding the evidentiary record. The expert's testimony would have assisted the jury in understanding how Johnson could repeatedly ignore K.R.'s screams to stop, but then drive her to the hospital for treatment, as well as explain why K.R. would tell Johnson to run instead of surrendering to police. Accordingly, the trial court did not abuse its discretion in admitting the expert testimony on intimate partner violence.

Even assuming the trial court erred in admitting this evidence, however, the error was not prejudicial. The evidence of torture was overwhelming, as the jury heard the testimony describing the multiple injuries Johnson inflicted on K.R., saw the photos of those injuries taken at the hospital, and heard the 911 call, as well as Johnson's recorded jail call to his mother describing his motivation for the attack. Johnson admitted that he inflicted great bodily injury on K.R. in an act of domestic violence. Under these circumstances, it is not reasonably probable that Johnson would have achieved a more favorable result in the absence of Dr. Mechanic's testimony. (*Prieto*, *supra*, 30 Cal.4th at p. 247.)

21

### *4*. *No due process violation*

Johnson's due process argument, i.e., that admitting Dr. Mechanic's testimony permitted the jury to draw an unreasonable inference as to his guilt, is similarly flawed. In Johnson's view, the jury was led to believe that because he shared characteristics of abusers, as described by Dr. Mechanic, he was more likely to be guilty of the charged offenses, again citing *Robbie* and *Yang*. Because, as he claims, the error violated his constitutional rights, we must therefore apply the harmless-beyond-a-reasonable-doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). We disagree.

"The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates "fundamental conceptions of justice." ' " (*Dowling v. United States* (1990) 493 U.S. 342, 352.) For the erroneous admission of evidence to amount to a denial of due process, the evidence must have been " ' "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." ' " (*People v. Dryden* (2021) 60 Cal.App.5th 1007, 1025-1026.) Dr. Mechanic's testimony does not meet that standard and Johnson's due process rights were not violated by its admission.

As discussed above, *Robbie* and *Yang* are distinguishable. Dr. Mechanic testified, in general terms, about intimate partner violence, but she did not know any of the particulars of this case. More importantly, Dr. Mechanic was not presented with hypothetical questions mirroring the facts of Johnson's assault on K.R. and asked to opine on whether those facts meant that Johnson had the intent to torture, kill, or maim

22

K.R.  During his testimony, Johnson admitted inflicting great bodily injury on K.R. while committing domestic violence and offered his own version of what took place that day.[11]

In addition, the jury was twice instructed that it could only consider Dr. Mechanic's testimony to determine if K.R.'s behavior was inconsistent with that of a victim of abuse, not as evidence Johnson committed any of the charged offenses. Because we are not presented with indications otherwise, we presume the jury heeded the trial court's instructions.  (*People v. Thomas* (2011) 51 Cal.4th 449, 487.)  That presumption is bolstered by the fact that the jury found Johnson not guilty on four[12] out of the nine charged offenses.  As discussed above, the trial court did not abuse its discretion in admitting Dr. Mechanic's testimony, but even if it had, the error was harmless under the applicable *Watson* standard.

### 5. *No ineffective assistance of counsel*

We have addressed Johnson's arguments that the trial court erred in admitting Dr. Mechanic's testimony, without regard to whether trial counsel did or did not interpose an appropriate objection to that testimony.  As a result, we need not reach his alternative argument that trial counsel was ineffective.  However, even if we were to consider that argument, we conclude it has no merit.

To demonstrate ineffective assistance of counsel, Johnson must first show trial counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms.  (*Strickland v. Washington* (1984)

---

[11] Johnson contends there was evidence supporting his testimony that he did not realize he had cut K.R. until blood was finally visible, stating that K.R. "did not think she needed medical care," and he had to "convince her to go to the hospital."  The jury, which heard the 911 call and observed Johnson's testimony, obviously found his testimony to be lacking in credibility and rejected his version of what took place.

[12] As a reminder, the jury found Johnson not guilty of attempted murder (count 1), aggravated mayhem (count 2), attempted kidnapping (count 4), and first degree burglary (count 7), though it found him guilty of lesser-included offenses of simple mayhem (count 2) and attempted false imprisonment (count 4).

466 U.S. 668, 687-688.)  Second, he must show prejudice flowing from counsel's performance or lack thereof.  (*Id*. at pp. 691-692.)  "Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different."  (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93, citing *Strickland*, *supra*, at pp. 687-688, 693-694.)  "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation."  (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)  It is the defendant's burden on appeal to show by a preponderance of the evidence that he was denied effective assistance of counsel and is entitled to relief.  (*People v. Dowdell* (2014) 227 Cal.App.4th 1388.)

As discussed above, the trial court did not err in admitting Dr. Mechanic's testimony on intimate partner violence.  " 'Counsel may not be deemed incompetent for failure to make meritless objections.' "  (*People v. Lucero* (2000) 23 Cal.4th 692, 732.)

### C. *No instructional error*

Johnson next argues the court erred in instructing the jury on torture with CALCRIM No. 810 as it failed to also instruct the jury with specific definitions for "extortion" and "sadistic purpose" and thus the jury could have returned a guilty verdict on this count based on an incorrect legal theory.  We disagree.

### 1. *Additional background*

In discussing jury instructions, the parties agreed that they did not want to include bracketed portions of CALCRIM No. 810 discussing extortion or sadistic purpose.  The court omitted the bracketed language,[13] but read the standard version of the instruction

---

[13] Specifically, the court omitted the following language:  "[Someone acts for purpose of *extortion* if he or she intends to (1) obtain a person's property with the (continued)

which informed the jury that, in order to find Johnson guilty of torture, "the People must prove that: [¶] 1. The defendant inflicted great bodily injury on someone else; [¶] AND [¶] 2. When inflicting the injury, the defendant intended to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (CALCRIM No. 810.) The court did not provide separate definitions for the terms "revenge," "extortion," "persuasion," or "sadistic purpose."

During opening argument, the prosecutor argued that Johnson attacked K.R. in revenge for her relationship with another man, as well as to persuade her to come with him. The prosecutor described K.R.'s injuries before turning to Johnson's motivation, saying "he's vengeful that she's moved on . . . that she's dating another man. He's pretty clearly angry at that. . . . He's inflicting great bodily injury on her because of that revenge. [¶] [Or] persuasion. It could be revenge or persuasion. She says no multiple times. 'No. I don't want to go with you. I don't want to go with you.' What does he do? He cuts her legs one by one, left and right, right and left. . . . The nerves, everything. . . . And all you need is revenge or persuasion for element number two for the crime of torture."

Defense counsel's final argument on torture was that there was no evidence that Johnson acted out of revenge or to persuade K.R.

In rebuttal argument, the prosecutor again described the severity of K.R.'s injuries before arguing that Johnson attacked her with the "intent to permanently disfigure her, deprive her of her ability to walk, use her legs. [¶] And it's also his intent to torture her. Because the whole reason he did this is because he wanted to inflict revenge on her. He

_____

person's consent and (2) obtain the person's consent through the use of force or fear.] [Someone acts for the purpose of *extortion* if he or she (1) intends to get a public official to do an official act and (2) uses force or fear to make the official do the act. An *official act* is an act that an officer does in his or her official capacity using the authority of his or her public office.] [Someone acts with a *sadistic purpose* if he or she intends to inflict pain on someone else in order to experience pleasure himself or herself.]" (CALCRIM No. 810.)

came into the house being mad at her, angry at her because she's hooked up with another guy. And after multiple attempts to take her with him, when she kept saying no, no. Persuasion. Cuts up her legs. Not just one leg, both the legs."

Neither defense counsel nor the prosecutor argued to the jury that Johnson tortured K.R. either to extort her or for a sadistic purpose.

### 2. *Applicable legal principles*

The trial court must instruct on general principles of law relevant to the issues raised by the evidence. (*People v. Beardslee* (1991) 53 Cal.3d 68, 87.) Insofar as a challenged instruction engendered any ambiguity, "we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction." (*People v. Smithey* (1999) 20 Cal.4th 936, 963.) We view the challenged instruction "in the context of the instructions as a whole and the trial record." (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.) We also "consider the arguments of counsel in assessing the probable impact of the instruction on the jury." (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

### 3. *No sua sponte duty to define "extortion" or "sadistic purpose"*

We first address Johnson's argument that the trial court had a sua sponte duty to define "sadistic purpose" when instructing the jury on torture. The California Supreme Court noted that "sadistic purpose" "is a term in common usage, having a relatively precise meaning" and that " 'there is no need to instruct a jury on the meaning of terms in common usage, which are presumed to be within the understanding of persons of ordinary intelligence.' (*People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1229-1230.)" (*People v. Raley* (1992) 2 Cal.4th 870, 901 (*Raley*).) As a result, the court's failure to provide the jury with a definition[14] of "sadistic purpose" was not error.

---

[14] As the California Supreme Court noted, even if the jury had requested a legal definition of "sadistic purpose," the trial court has no duty to provide one because "there is no *legal* definition of the term." (*Raley*, *supra*, 2 Cal.4th at p. 901.)

As for "extortion," we do not agree that the trial court was obligated to define this term either. Like "sadistic purposes," the term "extortion" is in common usage. (See *People v. Barrera*, *supra*, 14 Cal.App.4th at p. 1564 [noting that " 'sadistic purpose' and 'extortion' have consistently been used in this state in the area of torture murder without further definition being required"].)

Johnson relies on *People v. Hill* (1983) 141 Cal.App.3d 661 in which the court found error in failing to define extortion in connection with a kidnapping offense, but that case is distinguishable. In *Hill*, the trial court instructed the jury on kidnapping for the purpose of robbery and kidnapping for the purpose of ransom or extortion without separately defining ransom or extortion. (*Id*. at p. 667.) On review, the court concluded that the overlapping instructions could have misled the jury into thinking that kidnap for robbery was the equivalent as kidnap for extortion. (*Id*. at p. 668.) In addition, the court also noted that, while the term "extortion" "may be understood in a general sense, extortion as used in [kidnapping] has a technical meaning peculiar to the law[,] [and] [t]he court should have instructed on the legal definition of extortion." (*Ibid*.)

In *People v. Ordonez*, *supra*, 226 Cal.App.3d 1207 (*Ordonez*), the court did not provide the jury with a definition of extortion, even though the defendant was charged with felony murder with the underlying offense being kidnapping for ransom or extortion. On appeal, the court distinguished *Hill* on two grounds: (1) the prosecutor's argument at trial was based *only* on kidnapping for ransom thus the jury would not have been misled into convicting on the theory of kidnapping for extortion; and (2) the term extortion as used in the kidnapping statute (§ 209) has a particular meaning different from its common understanding. (*Ordonez*, *supra*, at pp. 1229-1230.)

In this case, like *Ordonez*, the prosecutor did not rely on "extortion" (or "sadistic purpose" for that matter) in asking the jury to conclude that Johnson tortured K.R. The only purposes argued to the jury were revenge and persuasion. There is no reasonable

27

possibility that the jury could have found Johnson's intent to injure K.R. was for extortion or sadistic purpose.

The record shows that the trial court afforded defense counsel ample opportunity to make suggestions or request modifications to the proposed instructions. The jury was properly instructed pursuant to CALCRIM No. 810 pursuant to the consent of both parties; by failing to request an instruction further defining or clarifying the meaning of "extortion" or "sadistic purpose," Johnson has waived this issue for the purposes of appeal. (*People v. Hardy* (1992) 2 Cal.4th 86, 153; *People v. Barillas* (1996) 49 Cal.App.4th 1012, 1023.)

The trial court did not have a sua sponte duty to define the terms "extortion" or "sadistic purpose" for the jury, any more than it had a duty to define "revenge" or "persuasion" because "there is no need to instruct a jury on the meaning of terms in common usage, which are presumed to be within the understanding of persons of ordinary intelligence." (*Ordonez*, *supra*, 226 Cal.App.3d at pp. 1229-1230.)

### 4. *No reasonable possibility the jury was confused*

Johnson also contends that the torture conviction must be reversed because the torture instruction permitted the jury to find him guilty based on an invalid theory. Where the court provides a legally correct instruction, but one with no application to the facts of the case, the error is one of state law subject to review under *People v. Watson*, *supra*, 46 Cal.2d at page 836. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129-1130.) While "extortion" and "sadistic purpose" were listed in CALCRIM No. 810, there were no facts presented that would have supported either of those purposes, and the prosecutor only argued that Johnson tortured K.R. for the purpose of revenge, persuasion, or both. As we have discussed above, there is no reasonable possibility the jury was confused by the lack of definitions for "extortion" or "sadistic purpose."

28

### 5. *No ineffective assistance of counsel*

Johnson argues, in the alternative, that if the court lacked a sua sponte duty to provide definitions of "extortion" and "sadistic purpose," then his trial counsel was constitutionally ineffective for failing to request those definitions or to ensure that those terms were excised from CALCRIM No. 810. As discussed above, those definitions were not necessary, and there was no reasonable possibility that Johnson was convicted on either theory. Accordingly, counsel did not provide ineffective assistance in this regard.

### D. *No cumulative error*

Johnson next contends that the cumulative effect of the purported errors discussed above warrants reversal of the judgment. As we have found no individual error, we reject his cumulative error argument.

### E. *Section 245, subdivision (a)(1) and (4), describe the same offense*

Johnson argues that he cannot be convicted of assault with force likely to cause great bodily injury in violation of section 245, subdivision (a)(4) (count 6) and assault with a deadly weapon in violation of section 245, subdivision (a)(1) (count 9) because the two subdivisions describe the same offense. The Attorney General agrees, noting that the California Supreme Court decided this question in Johnson's favor in *People v. Aguayo* (2022) 13 Cal.5th 974 (*Aguayo*).[15]

In *Aguayo*, the California Supreme Court concluded that subdivision (a)(1) and subdivision (a)(4) of section 245 are different statements of the same offense, and that one cannot be convicted of both offenses based on the same act or course of conduct. (*Aguayo*, *supra*, 13 Cal.5th at p. 993.)

Accordingly, we will remand the matter for the limited purpose of resentencing. We express no opinion as to whether the trial court, on remand, should strike the

---

[15] In his opening brief, Johnson noted that *Aguayo* was pending before the California Supreme Court.

conviction for assault with force likely to cause great bodily injury (count 6), the conviction for assault with a deadly weapon (count 9), or consolidate the two convictions. (*Aguayo*, *supra*, 13 Cal.5th at p. 996.)

### F. *Aggravating factors were established beyond a reasonable doubt*

After Johnson was sentenced, the Legislature amended section 1170 to allow an aggravated prison term to be imposed only if the aggravating factors supporting it are admitted by the defendant or found true by a jury. (Sen. Bill No. 567 (2020-2021 Reg. Sess.); Stats. 2021, ch. 731, § 1.3.) As an ameliorative change, that legislation applies retroactively to this case that is not yet final on appeal. (*In re Estrada* (1965) 63 Cal.2d 740, 747.) Johnson argues that, under the new standards, the court could not impose an upper term sentence on any of the substantive offenses or enhancements because he did not admit any of the aggravating facts relied on by the court nor did a jury find them true.

While the parties agree that the amendments to section 1170 have retroactive application, they disagree on the question of prejudice. We conclude that, under the circumstances of this case, a jury would have found at least two of the aggravating factors to be true and it is not reasonably likely the trial court would not have imposed upper term sentences.

The published opinions are in conflict on the standard to be applied when the court relies on multiple factors, some of which were not found by the jury or stipulated to by the defendant.[16] (Compare *People v. Flores* (2022) 75 Cal.App.5th 495, 500 [remand not required if appellate court concludes beyond a reasonable doubt that a jury would have found at least one aggravating factor true] with *People v. Lopez* (2022) 78 Cal.App.5th 459, 466 (*Lopez*) [all aggravating factors must have been found true beyond a reasonable doubt; if only some factors would have been found true, it must be reasonably probable the same sentence would have been imposed based on those] and *People v. Dunn* (2022)

---

[16] The issue is currently pending before our Supreme Court. (See *People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.], review granted Aug. 10, 2022, S274942.)

81 Cal.App.5th 394 (*Dunn*), review granted Oct. 12, 2022, S275655 [if at least one aggravating factor would have been found true beyond a reasonable doubt and it is reasonably probable any remaining aggravating factors relied on in imposing sentence would have been found true, assess likelihood of same sentence being imposed absent factors not meeting that standard].) (*Dunn*, *supra*, at p. 410.)

Johnson contends that we should apply the two-pronged test set forth in *Lopez*. At the first step of the *Lopez* analysis, the court, applying the standard set forth in *Chapman*, *supra*, 386 U.S. 18, decides whether "to conclude beyond a reasonable doubt that a jury would have found true beyond a reasonable doubt *every factor on which the court relied*, because the amended statute requires that every factor on which a court intends to rely in imposing an upper term, with the exception of factors related to a defendant's prior conviction(s), have been admitted by the defendant or proven to a jury." (*Lopez, supra*, 78 Cal.App.5th at p. 466.) If so, then the error is not prejudicial. (*Ibid.*) If not, then the analysis proceeds to the second step, where "a reviewing court can be certain, to the degree required by *People v. Watson*[, *supra*, 46 Cal.2d at page 836], that the trial court would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only" those aggravating factors that it could consider, "rather than all of the factors on which it previously relied." (*Id.* at p. 467, fn. 11.) If not, "then it is clear that remand to the trial court for resentencing is necessary." (*Ibid.*)

The Attorney General contends that we should apply the test from *Dunn*, which described the standard for assessing prejudice as follows: "The reviewing court determines (1)(a) beyond a reasonable doubt whether the jury would have found one aggravating circumstance true beyond a reasonable doubt and (1)(b) whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt. If all aggravating circumstances relied upon by the trial court would have been proved to the respective standards, any error was

31

harmless.  If not, the reviewing court moves to the second step of *Lopez*, (2) whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps.  If the answer is no, the error was harmless.  If the answer is yes, the reviewing court vacates the sentence and remands for resentencing."  (*Dunn, supra*, 81 Cal.App.5th at pp. 409-410, fn. omitted.)

*Lopez* requires the reviewing court to evaluate every factor on which the court relied, and we read *Dunn* to require at least one aggravating factor that the trial court actually relied upon to withstand *Chapman* scrutiny.  (See *Lopez, supra*, 78 Cal.App.5th at p. 466; *Dunn, supra*, 81 Cal.App.5th at pp. 409-410.)  We need not decide which of these approaches to employ because it is clear that, even under the more stringent standard set forth in *Lopez*, Johnson cannot show prejudice.

At sentencing, the trial court found no mitigating circumstances and four aggravating circumstances, specifically: "[](1) The crime involved great violence, great bodily harm and other acts disclosing a high degree of cruelty, viciousness, and callousness. [¶] [](2) The defendant used a weapon at the time of the offense. [¶] [] (3) The victim was particularly vulnerable. [¶] . . . [¶] [(4)] The defendant has engaged in violent conduct that indicates a serious danger to society."

There can be no question a jury would have found true at least two of these four factors.  First, Johnson admitted he used a weapon, i.e., a boxcutter, in committing the offense.  Second, Johnson admitted he inflicted great bodily injury on K.R., and because the jury found him guilty of torture, there can be no question that it would have found true the first aggravating factor as well, i.e., that the crime involved great bodily harm "disclosing a high degree of cruelty, viciousness, and callousness."

Assuming that the trial court had been limited to considering only those two aggravating factors in sentencing, it is not reasonably probable that it would have selected anything other than the upper term.  The trial court made clear that it believed Johnson's

conduct to be especially reprehensible, commenting that, in the course of her career as both a judge and a criminal attorney, she had never seen worse non-fatal injuries inflicted on a victim. Where the record " 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion[,]' [citation] [¶] . . . remand would be an idle act." (*People v. Flores* (2020) 9 Cal.5th 371, 432.)

As a result, there is no basis for resentencing Johnson pursuant to section 1170, as amended by Senate Bill No. 567.

### G. *Section 654*

Johnson next contends that the court erred in failing to apply section 654 to stay the terms on his convictions for attempted false imprisonment (count 4), domestic violence (count 5), the great bodily injury enhancement attached to count 5, and misdemeanor child endangerment (count 8). He further argues that the matter must be remanded for resentencing pursuant to the recent amendment to section 654 made by Assembly Bill No. 518. (Stats. 2021, ch. 441, § 1.)

#### 1. *Additional background*

At the sentencing hearing, the court addressed the incident, stating that Johnson had different objectives during the attack and had "multiple times to reflect and stop, but he didn't." In the trial court's view "there were some clear cut separations in the assaults and cutting that was happening." Towards the end of the assault, where it "appears the injuries to the legs occurred, based on the 911 call[,] . . . the objective and intent did change." Specifically, where Johnson tried to have K.R. leave with him, "that objective changes to really inflicting the extreme suffering and pain that is part of the torture act." The trial court concluded that "the evidence here showed that it was divisible. There were multiple times where [] Johnson could have stopped and walked away, and he chose to, again, resume the assaultive conduct, and at one point then becoming the intent, specific intent necessary for the torture count. [¶] I don't find here that all the discreet

33

acts were part of a course of conduct in which the torture was based." The court also expressly stated that it found "different objectives and intent" with respect to the child endangerment charge.

The court concluded that Johnson's intent changed to inflicting the "extreme suffering and pain that is part of the torture act." In discussing the aggravating factors, the court also noted that K.R.'s injuries were "the worst [she had] ever seen" on a victim who lived and that included her time as both a judge and practicing criminal law attorney. The court stated that Johnson did not appear to be genuinely remorseful, and "the crime involved great violence, great bodily harm, and other acts disclosing a high degree of cruelty, viciousness, and callousness."

### 2. *Applicable legal principles*

At the time of Johnson's sentencing, section 654 provided as follows: "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Former § 654, subd. (a).) The statute "precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on other ground in *People v. Correa* (2012) 54 Cal.4th 331, 334.)

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) "The court's findings may

34

be either express or implied from the court's ruling. [Citation.] In the absence of any reference to . . . section 654 during sentencing, the fact that the court did not stay the sentence on any count is generally deemed to reflect an implicit determination that each crime had a separate objective." (*People v. Tarris* (2009) 180 Cal.App.4th 612, 626.) The implied finding "must be sustained on appeal if supported by substantial evidence." (*People v. Osband* (1996) 13 Cal.4th 622, 730 (*Osband*).) In applying this standard, we "review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*Jones*, *supra*, at p. 1143.)

### 3. *The trial court would not impose a lower term even had it the discretion to do so*

Johnson argues that we must remand his case for resentencing based on recent change to section 654 made by Assembly Bill No. 518. Effective January 1, 2022, section 654 was amended by Assembly Bill No. 518. (Stats. 2021, ch. 441, § 1.) As amended, section 654, subdivision (a), provides in relevant part, "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision." (Italics added.) Previously, where section 654 applied, the sentencing court was required to impose the term that "provides for the longest potential term of imprisonment" and stay execution of the other term. (§ 654, former subd. (a).)

The Attorney General concedes that the legislative changes to section 654 apply to Johnson because his judgment is not yet final. We agree. (See *People v. Mani* (2022) 74 Cal.App.5th 343, 379; *People v. Sek* (2022) 74 Cal.App.5th 657, 673.) However, the Attorney General does not agree that this case should be remanded for resentencing under the amended version of section 654 because the court's comments at the sentencing hearing made clear that it would impose the higher term for torture even if it had the discretion to impose the lower terms.

35

We agree with the Attorney General that the record " 'clearly indicate[s]' " that the trial court necessarily would have sentenced Johnson the way it did even had it possessed the discretion afforded by amended section 654. (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; see also *People v. Jones* (2019) 32 Cal.App.5th 267, 273.) Again, the court expressly noted the horrific nature of K.R.'s injuries were "the worst [she had] ever seen" on a victim who lived and that included her time as both a judge and practicing criminal law attorney. The photographs of those injuries, which are part of the record, substantiate the trial court's assessment. Accordingly, we will turn to Johnson's claims that the trial court erred in failing to stay the terms on counts 4, 5 (including the enhancement), and 8.

### 4. *No error in declining to stay domestic violence term*

Johnson asserts that the trial court should have stayed the term on his domestic violence conviction because it was continuous to the torture offense and both offenses were committed with the same intent and close in time. In support of his argument, Johnson relies principally on *People v. Mitchell* (2016) 4 Cal.App.5th 349 (*Mitchell*) and *People v. Mejia* (2017) 9 Cal.App.5th 1036 (*Mejia*). We disagree.

In assessing whether section 654 applies, the court may consider a number of factors, including whether the defendant had multiple sequential intents, as well as whether he had the opportunity to pause and reflect before continuing his course of action. (*People v. Surdi* (1995) 35 Cal.App.4th 685, 689; *People v. Trotter* (1992) 7 Cal.App.4th 363, 368.) At the sentencing hearing, the court determined that Johnson's intent changed during the attack, morphing from an intent to simply injure his partner to an intent to torture her for her having a relationship with another man or for failing to leave with him or both. Drawing all inferences in favor of the court's finding on this matter, we conclude there is substantial evidence to support its decision. (*People v. Jones*, *supra*, 103 Cal.App.4th at p. 1143.) The recording of the 911 call indicates that Johnson had multiple opportunities to reflect on what he was doing, but he continued to

36

slash K.R. in spite of her screams and in spite of the entreaties from others in the home, including his child, to stop. We are not persuaded that *Mitchell* or *Mejia*, *supra*, 9 Cal.App.5th 1036 dictate a different result. The defendant in *Mitchell*, armed with a pair of scissors, entered a store and assaulted the clerk before grabbing two boxes of chips as he left. (*Mitchell*, *supra*, 4 Cal.App.5th at p. 352.) The court concluded that the defendant's "armed assault with scissors was incidental to and facilitated the armed robbery with scissors" and thus section 654 precluded separate punishment for the assault and the robbery. (*Mitchell*, *supra*, at p. 353.) The basis for the court's decision was that it determined the defendant did not harbor or form separate intents, and it expressly distinguished cases in which section 654 would not apply, such as where a "defendant commits two crimes . . . in pursuit of two independent objectives, even if they are simultaneous." (*Mitchell*, *supra*, at p. 354.)

In *Mejia*, after the defendant was convicted of torture, spousal rape, and infliction of corporal injury on a spouse, the court held that section 654 barred separate punishment for the rape and infliction of corporal injury offenses. (*Mejia*, *supra*, 9 Cal.App.5th at p. 1045.) Because the "prosecution relied upon each act of spousal rape and each act of infliction of corporal injury on a spouse as the intentional acts underlying the torture conviction," it made no difference whether the defendant had a single objective or multiple objectives. (*Ibid*.) However, the *Mejia* court acknowledged that a determination "[w]hether a particular offense is part of a course of conduct for purposes of section 654 is a question of fact." (*Ibid*.)

Here, in contrast, the court expressly discussed application of section 654 and found that Johnson had separate intents during his assault on K.R., and his initial conduct was not essential to the torture count nor did the prosecution rely on that to establish the elements of torture.

The California Supreme Court has upheld separate punishments where a defendant's consecutive intents result in distinct crimes of violence. (*People v. Jackson*

(2016) 1 Cal.5th 269.) In *Jackson*, the defendant entered a home in order to steal some of its contents, but when he discovered someone inside, he formed a separate intent to murder the occupant. "[Defendant]'s own statement suggests that he entered the house believing it was empty (suggesting an intent to steal), and developed the intent to harm [the victim] only when she appeared, startling him, and he panicked, finding that he was unable to leave. This evidence is sufficient to support the trial court's determination." (*Id*. at p. 354.)

In this case, there was substantial evidence that Johnson's intent changed from the time he initially entered the house to when he finally ended his attack. As a result, the trial court did not err by not staying the domestic violence term under section 654.

### 5. *No error in not staying attempted false imprisonment*

Johnson next argues that section 654 applies to his sentence for attempted false imprisonment because it shared the same objective as the torture offense, i.e., to persuade K.R. to go with him. We disagree.

The court imposed a four-month determinate term for the attempted false imprisonment, which appears to have been based on Johnson's grabbing K.R.'s clothing in an effort to force her to leave with him. The court declined to stay that four-month term because it concluded that Johnson's intent changed during the incident.

As discussed above, a trial court has "broad latitude" in determining "[w]hether section 654 applies in a given case," and "[i]ts findings [on that question] will not be reversed on appeal if there is any substantial evidence to support them." (*People v. Jones*, *supra*, 103 Cal.App.4th at p. 1143.) In this case, there is substantial evidence to support the trial court's conclusion that Johnson's intent changed during the attack, from wanting to force K.R. to go with him, to hurt her for refusing to listen to him, and to torture her for seeing someone else and for continuing to disobey him. The court did not err in declining to stay Johnson's sentence for attempted false imprisonment. (*Ibid*.)

38

### *6. No error in not staying great bodily injury enhancement*

Johnson also claims that the five-year enhancement for great bodily injury, attached to his domestic violence conviction, must be stayed because great bodily injury is an element of torture and the great bodily injury arose out of the same conduct and objective as the torture offense. We disagree.

At sentencing, the trial court imposed a five-year term for the great bodily injury enhancement as prescribed by section 12022.7, subdivision (e).

"The same type of enhancement may be imposed for each substantive offense committed with differing intent or for a different purpose. So long as the conduct giving rise to the convictions of separate substantive offenses is divisible or arises from separate criminal acts, neither section 654 nor [*People v. Ahmed* (2011)] 53 Cal.4th 156 requires the staying of the attached enhancements." (*People v. Wooten* (2013) 214 Cal.App.4th 121, 131.)

Johnson's argument is based on his assertion that his conduct and objective in committing domestic violence against K.R. was the same conduct and objective in torturing her in violation of section 206. The trial court concluded that Johnson's intent changed during the attack and there is substantial evidence to support that conclusion. As the trial court stated, his initial acts of attacking K.R. with a boxcutter was first an act of domestic violence but, as he became more enraged, his intent shifted to one in which he sought to not just hurt her badly, but to "cause cruel and extreme pain and suffering for the purpose of revenge [or] persuasion." Both his conduct and objectives were therefore divisible and the court did not err in declining to stay the great bodily injury enhancement.

### *7. No error in not staying child endangerment sentence*

Johnson's final section 654 argument is that the trial court erred in not staying the term for misdemeanor child endangerment on the ground that it was subject to the multiple victim exception. In his view, whether a particular crime is a crime of violence

for the purposes of the multiple victim exception to section 654 is determined by the statutory definition of the crime in question, and because the statute defining misdemeanor child endangerment does not indicate that it is a crime of violence, the multiple victim exception does not apply. We disagree.

The California Supreme Court has "long held that 'the limitations of section 654 do not apply to crimes of violence against multiple victims.' " (*People v. Oates* (2004) 32 Cal.4th 1048, 1063.) "Under this exception, 'even though a defendant entertains but a single principal objective during an indivisible course of conduct, he may be convicted and punished for each crime of violence committed against a different victim.' [Citations.] The reason for the multiple victim exception is that 'when a defendant " 'commits an act of violence with the intent to harm more than one person or by means likely to cause harm to several persons,' his greater culpability precludes application of section 654." ' " (*People v. Garcia* (1995) 32 Cal.App.4th 1756, 1781.) The multiple victim exception "permits one unstayed sentence per victim of all the violent crimes the defendant commits incidental to a single criminal intent." (*Id.* at p. 1784.)

Whether a defendant harbored a single intent—and thus a single objective—is a factual question; the applicability of section 654 to settled facts is a question of law. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) When interpreting the scope and meaning of the multiple victim exception, we apply a de novo standard of review. (See *People v. Perez* (1979) 23 Cal.3d 545, 552, fn. 5.) Regarding whether the facts establish there were multiple victims of the crimes of violence, we review such finding for substantial evidence. (See *People v. Centers* (1999) 73 Cal.App.4th 84, 101.) An appellate court will sustain a trial court's implied factual determination in the application of section 654 if supported by substantial evidence. (*Osband*, *supra*, 13 Cal.4th at pp. 730-731.)

In this case, there is substantial evidence to support the trial court's conclusion that the multiple victim exception applied to the misdemeanor child endangerment offense.

40

While Johnson's acts of violence were not directed at the child, that makes no difference. As explained by *People v. Pantoja* (2004) 122 Cal.App.4th 1, " 'A defendant who commits an act of violence with the intent to harm more than one person *or by a means likely to cause harm to several persons* is more culpable than a defendant who harms only one person. For example, a defendant who chooses a means of murder that places a planeload of passengers in danger, or results in injury to many persons, is properly subject to greater punishment than a defendant who chooses a means that harms only a single person. This distinction between an act of violence against the person that violates more than one statute and such an act that harms more than one person is well settled.' [Citation.] There is no requirement that the prosecution show that the defendant intended harm to each victim by his wrongdoing, and no doubt that defendant's acts harmed [the child]. Therefore he may be punished separately for that separate crime." (*Id.* at p. 16.)

Johnson entered K.R.'s home with a boxcutter and, soon thereafter, began to attack her with that weapon. It is reasonable to assume that he knew one or more of their children were present at the time; in fact, a child can be heard on the 911 call, screaming at Johnson to stop. While there is no evidence Johnson intended to physically harm the child, his conduct certainly risked such harm, either from the child deliberately trying to intervene or Johnson accidentally cutting the child while swinging the boxcutter at K.R. Even aside from the risk of physical injury, however, it goes without saying that this child likely suffered severe emotional trauma from witnessing his father brutally attack his mother.

Accordingly, we conclude the trial court properly applied the multiple victim exception to section 654 to Johnson's sentence for misdemeanor child endangerment.

### H. *The sentence for misdemeanor child endangerment must be reduced*

Johnson argues, and the Attorney General concedes, that the trial court erred in imposing a term of 364 days on his conviction for child endangerment (§ 273a; count 8). We agree.

41

Section 19 provides as follows: "Except in cases where a different punishment is prescribed by any law of this state, every offense declared to be a misdemeanor is punishable by imprisonment in the county jail not exceeding six months, or by fine not exceeding one thousand dollars ($1,000), or by both." Section 273a, subdivision (b) provides: "Any person who, under circumstances or conditions other than those likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health may be endangered, is guilty of a misdemeanor."

Because section 273a, subdivision (b) does not specify the punishment for a misdemeanor violation,[17] section 19 applies. We will reverse the judgment and remand the matter for the limited purpose of resentencing at which time the trial court will reduce Johnson's sentence on count 8 to six months.

### I. *The sentencing minute order and abstract of judgment must be corrected*

Johnson next argues that the minute order from his sentencing hearing and the abstract of judgment are incorrect in that they both indicate the court imposed a $10 fine under section 1202.5,[18] plus penalty assessments, for a total of $41. The trial court did not orally pronounce such a fine nor was Johnson convicted of an offense which supports imposing a fine pursuant to section 1202.5. The Attorney General agrees that Johnson

---

[17] Felony child endangerment is described in section 273a, subdivision (a) and "shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years."

[18] Section 1202.5 provides in pertinent part: "In any case in which a defendant is convicted of any of the offenses enumerated in Section 211, 215, 459, 470, 484, 487, subdivision (a) of Section 487a, or Section 488, or 594, the court shall order the defendant to pay a fine of ten dollars ($10) in addition to any other penalty or fine imposed." (*Id*., at subd. (a).)

was not convicted of any of the offenses listed in section 1202.5 and that the fine and penalty assessments must be stricken. We agree with the parties.

At sentencing, the trial court imposed certain other fines and fees, but did not order Johnson to pay a local crime prevention fee of $10, plus penalty assessments, pursuant to section 1202.5. The most likely reason for this was because Johnson was not "convicted of any of the offenses enumerated" in that statute. (§ 1202.5, subd. (a).) However, the minute order and abstract of judgment both indicate that Johnson is subject to a "local crime prevention fine of $10, plus penalty assessments; for a total of $41." "Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) On remand, the trial court shall ensure that the minute order from Johnson's resentencing and the abstract of judgment accurately reflect the fines and fees imposed.

### J. *Discretion to dismiss enhancements under section 1385*

Johnson also argues that, on remand, the trial court shall apply "current law" at his resentencing hearing, specifically to exercise its discretion to dismiss enhancements under section 1385. We express no opinion on how the trial court should exercise its discretion on remand but presume the trial court will resentence Johnson in accordance with current law.

### III.   DISPOSITION

The judgment is reversed and the matter is remanded for the limited purpose of resentencing. At the sentencing hearing, the trial court shall either consolidate the convictions on count 6 and count 9 or strike one of those convictions, reduce the sentence imposed on count 8 to six months, and resentence Johnson on all other counts consistent with this opinion and in accordance with current law. The trial court shall also ensure that the minute order and abstract of judgment accurately reflect the fines, fees, and assessments imposed.

43

_____
Wilson, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P.J.


_____
Danner, J.



People v. Johnson
H049257